IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

FILED

July 19, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

**FOR PUBLICATION**

**Filed:  July 19, 1999**

| | | |
|---|---|---|
| HELEN MCILVAIN, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | PUTNAM CHANCERY |
| | ) | |
| | ) | |
| Vs. | ) | HON. VERNON NEAL, |
| | ) | CHANCELLOR |
| | ) | |
| | ) | |
| RUSSELL STOVER CANDIES, INC. | ) | NO. 01-S-01-9709-CH-00208 |
| and ITT HARTFORD, | ) | |
| | ) | |
| Appellants. | ) | |

**For the Appellant:**
William E. Halfacre, III
MADEWELL, JARED & HALFACRE
Cookeville, Tennessee

**For the Appellee:**
Donald G. Dickerson
Cookeville, Tennessee

# O P I N I O N

WORKERS' COMPENSATION SPECIAL
APPEALS PANEL AFFIRMED, AS MODIFIED.                    ANDERSON, C.J

We granted the motion to review this workers' compensation case to determine two issues: 1) whether the evidence preponderates against the trial court's award of 40 percent permanent partial disability to each arm; and, 2) whether the age-based classification contained in Tenn. Code Ann. § 50-6-207(4)(A)(i) (1991 & Supp. 1998) applies to injured workers over age 60 who suffer injuries to scheduled members.

The Putnam County Chancery Court awarded benefits based on 400 weeks pursuant to Tenn. Code Ann. § 50-6-207(3)(A)(ii)(w) (1991 & Supp. 1998), finding that the Plaintiff's carpal tunnel syndrome arose out of and in the course of her employment and resulted in a 40 percent permanent partial disability to each arm for a total award of 160 weeks. The trial court further held that the age-based classification set forth in Tenn. Code Ann. § 50-6-207(4)(A)(i) pertains only to injured workers over age 60 who suffer disability to the body as a whole. The Workers' Compensation Special Appeals Panel affirmed the trial court's award but held that the age-based classification placed a 260 week cap on an award to a worker over age 60 who suffers injury to a scheduled member. After our review of the record and applicable authorities, we affirm the Panel's judgment as modified.

## BACKGROUND

According to the record, Plaintiff Helen McIlvain ("McIlvain") has completed two years of high school, has obtained a GED, and has completed some vocational training courses. McIlvain's work history reflects that she has worked approximately 45 years in various jobs requiring repetitive use of her hands such as lifting, driving, and writing.

McIlvain began working for Defendant Russell Stover Candies, Inc. ("Russell Stover") on May 2, 1994. Her work involved packing candy or working in the "nut room," where she was required to pick through the nuts to remove any foreign objects. Both these jobs required McIlvain to make repetitive use of her hands and wrists.

The record reflects that McIlvain has no family history for carpal tunnel syndrome, and that she had never experienced any problems with her hands before working for Russell Stover. McIlvain testified that her symptoms first arose around July of 1996 while she was working for Russell Stover. At that time, she began to experience pain, tingling, and numbness in her wrists which has disrupted her sleep, and has interfered with her ability to work, drive a car, and perform chores such as vacuuming, washing dishes, dusting, sewing or tightening the caps on jars. As a result, McIlvain often requires her husband's assistance. At the onset of these symptoms, McIlvain was 61 years old.

McIlvain's husband testified that he has taken over the chores at home and the antique store which he owns and operates with his wife, that he has observed his wife's pain and difficulty when driving a car, and that he now mends his own clothes, has to help his wife with buttons and snaps on her clothing, and often has to sleep in a separate room since McIlvain's restlessness disturbs his sleep. He further testified that his wife never had these problems prior to her work at Russell Stover, and that he observes her condition as continually getting worse.

All medical proof in the record was entered through deposition and consists of the opinions from four different physicians. Russell Stover first sent McIlvain to Dr. Kenneth Colburn, a family practitioner. After one visit with McIlvain, Dr. Colburn diagnosed her as having a classic case of bilateral carpal tunnel syndrome and temporarily restricted McIlvain from returning to work.

After Dr. Colburn restricted McIlvain from work, Russell Stover sent McIlvain to see Dr. John Clough. According to Dr. Clough's office notes, Dr. Clough diagnosed McIlvain as suffering from tenosynovitis and possibly early carpal tunnel syndrome. Though Dr. Clough restricted McIlvain from repetitive motion, he felt that she could begin performing light duty work for Russell Stover. Consequently, McIlvain returned to work, but she requested a second opinion regarding whether she had carpal tunnel

syndrome. Russell Stover referred her to Dr. Toney Hudson, a practitioner of occupational medicine and preventative health.

Dr. Hudson saw McIlvain in his office a total of eight times. Dr. Hudson testified that he ultimately diagnosed McIlvain with "bilateral carpal tunnel syndrome that had improved." According to Dr. Hudson, the cause of the carpal tunnel syndrome was "multi-factorial," stemming from McIlvain's present work, her past work, and her age. Though Dr. Hudson opined that McIlvain would retain a zero percent impairment, he restricted her from working at Russell Stover, explaining that she could still perform in the labor market if she avoids highly repetitive work.

The last deposition entered as medical proof was that of Dr. Richard Fishbein, an orthopaedic surgeon. Dr. Fishbein opined that McIlvain had a 5 percent impairment to both arms caused by carpal tunnel disease which was more probably than not caused by working at Russell Stover. Dr. Fishbein placed restrictions on McIlvain's activities, especially recommending that McIlvain avoid repetitive hand and wrist movements.

The only witness other than McIlvain and her husband to testify at trial was Bill Patterson, a private investigator Russell Stover hired to covertly videotape McIlvain. Patterson discovered that McIlvain worked part-time in an antique store. He testified that he went to the antique store and secretly videotaped McIlvain flipping through the yellow pages, dialing a push button phone, carrying items from her minivan to the store, and carrying a sign to put outside the store. Patterson testified McIlvain exhibited no difficulty in any of these activities.

McIlvain conceded that she and her husband had owned and operated the antique store for about five years and that she had not mentioned the store to either Dr. Hudson or Dr. Fishbein; however, she further testified that her work at the antique store required no repetitive hand movements and that her husband performed any work

which would otherwise cause discomfort to her hands and wrists. There was also evidence that such work was not gainful employment.

Russell Stover argued before the trial court that the age-based classification contained in Tenn. Code Ann. § 50-6-207(4)(A)(i) should apply to reduce McIlvain's award by offsetting Social Security retirement benefits she received. Over the sustained objection of McIlvain's counsel, Russell Stover entered into the record proof that McIlvain has been receiving Social Security retirement insurance benefits.

After the presentation of all the proof, the trial judge found that McIlvain suffered from bilateral carpal tunnel syndrome which arose out of and in the course of her employment with Russell Stover. The trial judge noted that all of the medical depositions supported this finding and stated that "there's no evidence that she did any repetitive manipulation with her hands in the antique shop that brought about this condition." The trial judge considered Dr. Fishbein's deposition testimony to be more persuasive than Dr. Hudson's testimony based on the fact that "Dr. Hudson, even though he didn't feel like that there was any medical disability, . . . did feel like . . . she should change careers."

The trial court rejected Russell Stover's argument that the age-based classification contained in Tenn. Code Ann. § 50-6-207(4)(A)(i) should apply to reduce McIlvain's award by offsetting Social Security retirement benefits she received, reasoning that our holding in Vogel v. Wells Fargo Guard Serv., 937 S.W.2d 856 (Tenn. 1996), only extended the age-based classification to permanent partial disability awards to the body as a whole but not to scheduled members. Accordingly, the trial court held that § -207(4)(A)(i) was inapplicable to the present case and awarded 40 percent vocational disability to each arm, based on 400 weeks, entitling McIlvain to 160 weeks of benefits at the rate of $196.69 per week. The applicable workers' compensation rate resulted in McIlvain receiving a judgment of $31,470.40 for permanent partial disability benefits.

-5-

The Workers' Compensation Special Appeals Panel held that the evidence did not preponderate against the trial court's finding of disability. Rejecting Russell Stover's argument that under Vogel, McIlvain's recovery should be limited to 40 percent of 260 weeks, and noting that in this case, the award of 160 weeks did not exceed § -207(4)(A)(i)'s cap of 260 weeks, the Panel held that "disability benefits are to be based on the schedule contained in Tenn. Code Ann. section 50-6-207(3)(A)(ii), but are subject to the maximum contained in Tenn. Code Ann. section 50-6-207(4)(A)(i)."

We granted Russell Stover's motion for review.

## ANALYSIS

### Percentage of Disability

We begin our analysis by noting the applicable standard by which to review workers' compensation cases. Issues of fact are reviewed de novo upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2) (1991 & Supp. 1998). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. E.g., Collins v. Howmet Corp., 970 S.W.2d 941, 943 (Tenn. 1998). However, where the issues involve expert medical testimony, and all the medical proof is contained in the record by deposition, as it is in this case, then this Court may draw its own conclusions about the weight and credibility of that testimony, since we are in the same position as the trial judge. E.g., Krick v. City of Lawrenceburg, 945 S.W.2d 709, 712 (Tenn. 1997).

The extent of vocational disability is a question of fact to be determined from all the evidence, including lay and expert testimony. E.g., Henson v. City of Lawrenceburg, 851 S.W.2d 809, 812 (Tenn. 1993). Factors to be considered in determining the extent of vocational disability include the employee's job skills and training, education, age, extent of anatomical impairment, duration of impairment, local

job opportunities, and the employee's capacity to work at the kinds of employment available to her in her disabled condition. E.g., Perkins v. Enterprise Truck Lines, Inc., 896 S.W.2d 123, 127 (Tenn. 1995). The employee's own assessment of her physical condition and resulting disability is competent testimony that should be considered as well. Id.

With these principles in mind, we review the record to determine whether the evidence preponderates against the trial court's finding of 40 percent permanent partial disability to each arm. The record reveals several factors which support the trial court's decision on vocational disability. Both McIlvain and her husband testified that she is no longer able to do household chores, she has difficulty and pain when driving or writing, and she has disrupted sleep. Mr. McIlvain testified that he has had to take over chores at home and the antique store, and has to help his wife perform simple tasks like buttoning and snapping clothing or tightening jar lids.

With respect to McIlvain's job skills and training, the proof reflects that every employment McIlvain has had which might allow her to obtain another similar job in Tennessee has required McIlvain to make repetitive use of her hands and wrists.[1] The medical proof in the record, however, is unequivocal in restricting McIlvain from making repetitive use of her hands and wrists. This restriction weighs heavily in support of the trial court's assessment of disability.

In insisting that the evidence preponderates against the trial court's award of disability, Russell Stover emphasizes: 1) Dr. Hudson's finding of zero percent impairment; 2) McIlvain's work at her antique store; and, 3) McIlvain's statement to Dr. Colburn that she intended to retire. However, our review of the record and the detailed findings of the trial judge reveals that the trial judge properly took all these factors into consideration. We agree with the trial court that Dr. Hudson's finding of zero percent

---

[1] The only job in McIlvain's work history which did not require her to write, drive, lift, or make repetitive use of her hands was that of a manager for a bingo parlor business which, as noted by the trial court, offers McIlvain little practical use in Tennessee since for-profit bingo is an illegal lottery. Tenn. Const. art. XI, § 5; Secretary of State v. St. Augustine Church, 766 S.W.2d 499 (Tenn. 1989).

impairment seems inconsistent with his restricting her from work and is insufficient to preponderate against other medical proof in the record.

As to the issue of McIlvain's work at the antique store, Patterson's testimony fails to overcome the trial court's finding that this work required no repetitive hand and wrist movements. Further, the trial court clearly considered the factor of McIlvain's age, which, in our view, is relevant to whether McIlvain would soon retire. Accordingly, after considering all the evidence in the record, the parties' arguments, and applicable law, we conclude that the evidence fails to preponderate against the trial court's finding of 40 percent permanent partial disability to both arms arising out of and in the course of McIlvain's employment with Russell Stover.

## Section 207

We now turn to the issue of whether the age-based classification contained in Tenn. Code Ann. § 50-6-207(4)(A)(i) applies to reduce the award of an injured worker over age 60 who has sustained a permanent partial disability to a scheduled member. The relevant statutory provision states that:

> compensation shall be paid during the period of such permanent total disability until the employee reaches the age of sixty-five (65); provided, that <u>with respect to disabilities resulting from injuries which occur after age sixty (60), regardless of the age of the employee, permanent total disability benefits are payable for a period of two hundred sixty (260) weeks</u>. Such compensation payments shall be reduced by the amount of any old age insurance benefit payments attributable to employer contributions which the employee may receive under the Social Security Act, U.S.C., title 42, chapter 7, subchapter II, as amended.

Id. (emphasis added).

Relying on our opinion in <u>Vogel</u>, 937 S.W.2d 856, Russell Stover argues that McIlvain's Social Security retirement benefits should be offset against her disability award because the age-based classification contained in Tenn. Code Ann. § 50-6-207(4)(A)(i) applies not only to injured workers over age 60 who suffer injury to the body as a whole but also to such workers who suffer injury to scheduled members and that

McIlvain's award should have been based on 40 percent of 260 weeks rather than 40 percent of 400 weeks. McIlvain argues, on the other hand, that Tenn. Code Ann. § 50-6-207(4)(A)(i), as interpreted by Vogel, is meant to apply only to injured workers over age 60 who suffer an injury to the body as a whole, whether total or partial, and that in any event, McIlvain's award would be unaffected by any interpretation of the statute which would cap her award at 260 weeks since her award was for 160 weeks.

In Vogel, the 73-year-old plaintiff sustained injury resulting in a permanent total disability, and the statute clearly applied. In reversing the trial court's holding that the age-based distinction was unconstitutional, we held that such distinction was rationally related to the legitimate state interest of tying 'workers' compensation benefits for workers who are permanently and totally disabled to the commencement of Social Security benefits." Id. at 860-61. However, reasoning that the disability-based distinction was irrational because a permanently partially disabled worker was subject to receive a greater award than a permanently totally disabled worker, we concluded that "the 260 week cap set forth in Tennessee Code Annotated Section 50-6-207(4)(A)(i) applies to all injured workers over sixty who are awarded benefits under the Workers' Compensation statute for permanent partial or permanent total disability." Id. at 862.

Our holding in Vogel remedied the otherwise irrational result of a permanently totally disabled worker, such as the plaintiff in Vogel, from receiving a smaller award than a similarly situated, yet permanently partially disabled worker. Both the facts of Vogel and the explicit language of the relevant portion of the statute, however, were limited to injuries to the body as a whole, i.e. "permanent total disability." See Vogel 937 S.W.2d at 857; § -207(4)(A)(i). It is well-settled that "[w]hen the injury is to a scheduled member, the disability award is exclusively controlled by the impairment rating established by the General Assembly for that member." E.g., Reagan v. Tennessee Mun. League, 751 S.W.2d 842, 843 (Tenn. 1988) (emphasis added). We can imagine a situation in which a worker over age 60 who sustains a permanent total disability or a permanent partial disability to the body as a whole receives a smaller

award than a worker over age 60 who receives a permanent partial disability to a scheduled member, and perhaps Russell Stover's argument that the award should be based on a percentage of 260 weeks addresses this discrepancy. As we noted in Vogel, however, "[i]t is the business of the legislature to pass new laws and modify existing ones." Id. at 862. Accordingly, in our view, Tenn. Code Ann. § 50-6-207(4)(A)(i) applies to workers over age 60 who suffer injuries to the body as a whole, whether permanent partial or permanent total, but not to such workers who suffer scheduled member injuries.

### CONCLUSION

After considering the record, the parties' arguments, and applicable law, we conclude that the evidence does not preponderate against the trial court's award of 40 percent permanent partial disability to each arm. We further conclude that the age-based classification contained in Tenn. Code Ann. § 50-6-207(4)(A)(i) does not apply to a worker over age 60 who suffers injury to a scheduled member. Accordingly, we affirm the judgment of the Workers' Compensation Special Appeals Panel as modified and remand to the trial court for further proceedings consistent with this opinion. Costs of appeal are assessed against appellants for which execution shall issue if necessary.

_____
RILEY ANDERSON, CHIEF JUSTICE

**CONCUR:**

Drowota, Birch, Holder, Barker, JJ.

-10-