**Ruth CANTRELL**

v.

**CARRIER CORPORATION, et al.**

Supreme Court of Tennessee,
at Nashville.

Feb. 1, 2006 Session.

May 30, 2006.

**470**

Bruce Timothy Pirtle, McMinnville, Tennessee, for the Appellant–Defendant, Carrier Corporation.

Barry H. Medley, McMinnville, Tennessee, for the Appellee–Plaintiff, Ruth Cantrell.

## OPINION

JANICE M. HOLDER, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and E. RILEY ANDERSON and CORNELIA A. CLARK, JJ., joined. ADOLPHO A. BIRCH, JR., J., not participating.

The plaintiff developed carpal tunnel syndrome in both arms while employed by the defendant. We granted this appeal to determine whether an eight-week leave of absence during which the defendant paid the plaintiff short-term disability benefits unrelated to the carpal tunnel syndrome should be included in the average weekly wage calculation. We conclude that the days during which the plaintiff was on leave of absence should be excluded from the average weekly wage calculation. We further conclude that the record supports the trial court's permanent disability award of 50% to the left arm and 45% to the right arm but that the separate awards should be combined and averaged to equal 47.5% for the loss of two arms. Accordingly, the findings of the Special Workers' Compensation Appeals Panel are adopted in part and rejected in part. The trial court's judgment is affirmed in part, modified in part, and reversed in part, and the case is remanded for further proceedings in accordance with this opinion.

The plaintiff, Ruth Cantrell ("Mrs.Cantrell"), developed carpal tunnel syndrome in both wrists while employed by the defendant, Carrier Corporation ("Carrier"). On February 18, 2000, a surgical release was performed on Mrs. Cantrell's right wrist. She returned to work on light duty with restrictions from a prior, unrelated injury. On June 14, 2002, a surgical release was performed on Mrs. Cantrell's left wrist. Following surgery on her left wrist, Mrs. Cantrell experienced decreased range of motion in her left thumb.

On October 4, 2002, Mrs. Cantrell was released to return to work. Carrier, however, did not have any jobs available to Mrs. Cantrell that fit within her permanent restrictions. At the time of trial, Mrs. Cantrell had not returned to work.

The trial court awarded Mrs. Cantrell compensation for injuries to her right arm, left arm, and left thumb. In calculating Mrs. Cantrell's average weekly wage for the fifty-two weeks preceding the injuries, the trial court included eight weeks during which Mrs. Cantrell was on leave of absence and received disability benefits for unrelated injuries. The trial court combined the left arm and left thumb injuries and assigned a permanent impairment rating of 50% to the left arm and 45% to the right arm.

The Special Workers' Compensation Appeals Panel reduced the trial court's award to 35% to the left arm and 20% to the right arm and declined to address the issue of the compensation rate to be used in the computation of the award. We granted review.

## ANALYSIS

### A. Compensation Rate

■ We shall first address the issue of Mrs. Cantrell's compensation rate. Mrs. Cantrell raised this issue in the trial court and in her response to Carrier's notice of appeal. The Panel declined to address Mrs. Cantrell's compensation rate because she did not file a separate notice of appeal.

■ Rule 13(a) of the Tennessee Rules of Appellate Procedure provides, in pertinent part, that "any question of law may be brought up for review and relief by any party. Cross-appeals, separate appeals, and separate applications for permission to appeal are not required. Dismissal of the original appeal shall not preclude issues raised by another party from being considered by an appellate court." This rule rejects the application of a notice of appeal as a review-limiting device. Advisory Comm'n Comments to Tenn. R.App. P. 13(a). When a party to a lawsuit properly perfects an appeal, the appellee need not file a separate notice of appeal to obtain review of additional issues and may raise additional issues in its responsive brief. *State v. Russell,* 800 S.W.2d 169, 171 (Tenn.1990). Accordingly, the issue of Mrs. Cantrell's compensation rate was properly preserved on appeal.

An employee's compensation rate for an award of permanent partial disability is equal to 66 $\frac{2}{3}$% of the employee's average weekly wage. Tenn.Code Ann. § 50–6–207(3)(A) (1999). "Average weekly wages" are defined as "the earnings of the injured employee in the employment in which the injured employee was working at the time of the injury during the period of fifty-two (52) weeks immediately preceding the date of the injury divided by fifty-two (52)[.]" Tenn.Code Ann. § 50–6–102(2)(A) (1999).[1]

The trial court found that the date of Mrs. Cantrell's right carpal tunnel injury was July 30, 1999, the date on which Mrs. Cantrell first reported problems with her right wrist to Carrier. *See Bone v. Saturn Corp.,* 148 S.W.3d 69, 74 (Tenn.2004) (holding that the date of injury for purposes of calculating compensation rates was the date on which the employee gave the employer actual notice of the gradually occurring injury prior to missing time from work due to the injury). Because both parties agree that Mrs. Cantrell reported both injuries at the same time, the date of Mrs. Cantrell's left carpal tunnel injury was also July 30, 1999.

During the fifty-two weeks preceding July 30, 1999, Mrs. Cantrell was on various leaves of absence from work for a total of eight weeks due to illness and injuries unrelated to the carpal tunnel syndrome. During those eight weeks, Carrier paid Mrs. Cantrell $220.00 per week in short-term disability benefits. The number of days that Mrs. Cantrell worked and the wages that she received each week varied during the remainder of the fifty-two week period. The lowest amount of wages that Mrs. Cantrell received for a five-day work week was $637.70.

■ In calculating average weekly wages,

> if the injured employee lost more than seven (7) days during the period when the injured employee did not work, although not in the same week, then the earnings for the remainder of the fifty-two (52) weeks shall be divided by the number of weeks remaining after the time so lost has been deducted.

Tenn.Code Ann. § 50–6–102(2)(A) (1999). Days not worked by an employee must be

---

1. The provisions regarding the calculation of the average weekly wage currently appear in Tennessee Code Annotated section 50–6–102(3)(A)–(D) (2005).

deducted from the fifty-two week period if the inability to work is the result of "sickness, disability, or some other fortuitous circumstance." *Russell v. Genesco, Inc.*, 651 S.W.2d 206, 210 (Tenn.1983). Examples of "fortuitous circumstances" are the closing of a plant for repairs, the occasional loss of working time due to bad weather, or a reduction of work due to market-driven reasons, such as an unforeseen shortage of material or a lack of orders. *See Hartley v. Liberty Mut. Ins. Co.*, 197 Tenn. 504, 276 S.W.2d 1, 4 (1954) (listing these circumstances as those that do not justify a decrease in an employee's average weekly wage); *see also Bryant v. McAllister*, 202 Tenn. 654, 308 S.W.2d 412, 413–14 (1957). Deducting "lost" days will benefit the employee when the wages for a fifty-two week period are divided by a smaller number of days worked.

On the other hand, an employee whose work hours vary from week to week will not be given the benefit of the deduction of days not worked if the employer simply had less work for the employee. *See Carter v. Victor Chem. Works*, 171 Tenn. 141, 101 S.W.2d 462, 464 (1937). For example, a stonemason or bricklayer who is employed regularly by a building contractor and paid by the hour or day cannot work in inclement weather. *Id.* at 463. Provisions for these expected suspensions of working time are made through an increase in the hourly or daily wage rate paid to the worker. *Id.* The determination of whether a day an employee does not work should be deducted from the computation of the average weekly wage is dependent upon the facts and circumstances of each case.

In the present case, the parties agree that Mrs. Cantrell's leaves of absence were the result of sickness or disability and that the eight-week period normally would be deducted in computing her average weekly wage. Carrier maintains, however, that these weeks and the short-term disability benefits that Mrs. Cantrell received during those weeks should be included in the average weekly wage calculation. We disagree.

The plain language of Tennessee Code Annotated section 50–6–102(2)(A) (1999) mandates that days be deducted from the computation of the average weekly wage "during the period when the injured employee did not work." The statute does not contain an exception for those days in which the employee did not work due to illness or disability but received disability benefits from the employer. We decline to depart from the plain and unambiguous language contained within the four corners of the statute. *Wausau Ins. Co. v. Dorsett*, 172 S.W.3d 538, 543 (Tenn.2005). Because the eight weeks during which Mrs. Cantrell was on a leave of absence constituted lost days due to sickness or disability, those days and the disability benefits received must be excluded from the computation of her average weekly wage. *See* Tenn.Code Ann. § 50–6–102(2)(A); *Russell*, 651 S.W.2d at 210.

Our holding is consistent with the purposes of the Tennessee Workers' Compensation Law. The statute is remedial in nature and must be given a liberal and equitable construction in favor of the employee. *Long v. Mid–Tenn. Ford Truck Sales, Inc.*, 160 S.W.3d 504, 510 (Tenn.2005). One of the purposes of the statute is to " 'provide injured workers with periodic payments as a substitute for lost wages in a manner consistent with the worker's regular wage.' " *Wilkins v. Kellogg Co.*, 48 S.W.3d 148, 153 (Tenn.2001) (quoting *Mackie v. Young Sales Corp.*, 44 S.W.3d 459, 461 (Tenn.2001), withdrawn and republished at 51 S.W.3d 554 (Tenn. 2001)). Therefore, we must construe the workers' compensation law to ensure that

injured employees are justly and appropriately reimbursed for debilitating injuries suffered in the course of their employment. *Mackie*, 51 S.W.3d at 556.

The inclusion of those days during which an employee does not work but for which the employer pays short-term disability benefits in an amount less than the employee's wages would result in an average weekly wage calculation inconsistent with the employee's regular wages. Furthermore, an employer could provide an employee with a trivial amount of disability benefits during "lost" days for the purpose of reducing the average weekly wage. As a result, the employee would not receive a just and appropriate reimbursement for the employee's employment-related injuries.

■ We are similarly unpersuaded by Carrier's position that it should be permitted to set off the short term disability payments pursuant to Tennessee Code Annotated section 50–6–114(b) (1999) from the total compensation paid to Mrs. Cantrell. Section 50–6–114(b) permits an employer to set off disability benefits paid to the employee for the "same injury." Mrs. Cantrell's eight-week absence and the short-term disability benefits are unrelated to the carpal tunnel syndrome which is the subject of this claim. The statute's plain language precludes its application to the facts of this case. Any extension of the statute to disability benefits unrelated to the injuries for which an employee is seeking compensation is more appropriately addressed to the legislature.

### B. Permanent Disability Award

■ Mrs. Cantrell contends that the Special Workers' Compensation Appeals Panel erred in reducing the trial court's permanent disability awards of 50% for the left arm and 45% for the right arm to 35% for the left arm and 20% for the

right arm. The extent of an injured employee's permanent disability involves a question of fact. *Lang v. Nissan N. Am., Inc.*, 170 S.W.3d 564, 569 (Tenn.2005). We must review the trial court's findings of fact in a workers' compensation case de novo upon the record of the trial court, accompanied by a presumption that these findings are correct unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50–6–225(e)(2) (1999). In reviewing documentary proof such as expert medical testimony presented by deposition, we need not extend the same deference to the trial court's findings as required for issues concerning the credibility and weight of oral testimony. *Lang*, 170 S.W.3d at 569. Ultimately, we must conduct an independent review of the evidence to determine where the preponderance of the evidence lies. *See* Tenn.Code Ann. § 50–6–225(e)(2) (1999); *Cleek v. Wal–Mart Stores, Inc.*, 19 S.W.3d 770, 773–74 (Tenn.2000).

■ An employee is not required to establish vocational disability or loss of earning capacity to be entitled to benefits for the loss of use of a scheduled member. *Lang*, 170 S.W.3d at 569. Proof of vocational disability, however, is admissible in determining the amount of scheduled member benefits to which the employee is entitled. *Duncan v. Boeing Tenn., Inc.*, 825 S.W.2d 416, 417–18 (Tenn.1992). Vocational disability results when "the employee's ability to earn wages in any form of employment that would have been available to him in an uninjured condition is diminished by an injury." *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 459 (Tenn.1988). A trial court must consider all relevant evidence, including expert and lay testimony, in determining the extent of vocational disability. *Lang*, 170 S.W.3d at 570. Factors that a trial court may consider include the employee's age,

education, job skills and training, the extent and duration of anatomical impairment, local job opportunities, and the employee's capacity to work at the kinds of employment available to one in the employee's disabled condition. *McIlvain v. Russell Stover Candies, Inc.,* 996 S.W.2d 179, 183 (Tenn.1999).

Applying these factors to the present case, we observe that Mrs. Cantrell was fifty-three years old at the time of trial and has a ninth-grade education. She has poor writing and math skills and has no special skills or training. She has never performed clerical or computer-related tasks or held a supervisory or management position.

The trial court accredited the testimony of Mrs. Cantrell and her husband, David Cantrell ("Mr.Cantrell"), regarding her condition. Both Mr. and Mrs. Cantrell testified that Mrs. Cantrell has problems cleaning their home, mowing their yard, sleeping, and driving as a result of her injuries. Mrs. Cantrell further testified regarding her various jobs prior to her employment with Carrier but stated that she would not be able to perform those tasks now due to her injuries.

The trial court also considered the deposition testimony of Dr. Rodger Zwemer, an orthopedic surgeon who was Mrs. Cantrell's treating physician, and Dr. Robert Landsberg, an orthopedic surgeon who performed an independent medical examination of Mrs. Cantrell. Dr. Zwemer detailed the treatment that he provided to Mrs. Cantrell for her carpal tunnel syndrome and testified that Mrs. Cantrell suffered permanent impairment to both arms. With regard to the right carpal tunnel syndrome, Dr. Zwemer assigned a 10% permanent impairment rating to the upper right extremity in accordance with the fourth edition of the American Medical Association Guidelines for Permanent Impairment ("AMA Guides"). He stated that the permanent impairment rating is 5% under the fifth edition of the AMA Guides. Dr. Zwemer assigned a 5% permanent impairment rating to the upper left extremity pursuant to the fifth edition of the AMA Guides for the left carpal tunnel syndrome. He also observed that Mrs. Cantrell experienced problems opposing her left thumb following the left carpal tunnel release. Dr. Zwemer assigned a permanent weight-lifting restriction of ten to fifteen pounds.

On October 4, 2002, Dr. Zwemer released Mrs. Cantrell to return to work. Carrier did not have any jobs available to someone with Mrs. Cantrell's permanent restrictions, and Mrs. Cantrell did not return to work.

On January 22, 2003, Dr. Landsberg conducted an independent medical examination of Mrs. Cantrell who complained of aches and numbness in her forearms. She did not complain of numbness or tingling in her hands with the exception of occasional occurrences in one of her little fingers. She reported basal thumb pain in her right thumb which worsened with gripping and resulted in cramping into the base of the thumb. Mrs. Cantrell also reported stiffness in her left hand and the inability to move her left thumb across to her little finger as she could do with her right thumb. Dr. Landsberg also noted Mrs. Cantrell's report of stinging and tingling in her right wrist which did not radiate into her fingers.

Upon examining Mrs. Cantrell's wrists, Dr. Landsberg found that Mrs. Cantrell's right cubital tunnel was tender but there was no tingling into her fingers. The wrist flexion test caused pressure in her right carpal tunnel, pulling into her right wrist, and cramping into both hands. Dr. Landsberg found decreased range of motion in her left thumb, but the remaining ranges of motion were "quite good."

Dr. Landsberg diagnosed Mrs. Cantrell with mild residual bilateral carpal tunnel syndrome with hand inflammation and stiffness in her left thumb. Dr. Landsberg testified that Mrs. Cantrell suffered permanent impairment as a result of the carpal tunnel syndrome. He did not assign anatomical impairment ratings for these injuries but relied upon Dr. Zwemer's ratings. Dr. Landsberg assigned an anatomical impairment rating of 1% to the left hand or left upper extremity due to the mild decrease in adduction of the left thumb across the palm. He assigned permanent restrictions and instructed Mrs. Cantrell to avoid repetitive gripping and squeezing, repetitive pounding with her hands, and repetitive use of vibratory or pneumatic tools.

The trial court also considered the report of a "Functional Capacity Evaluation" of Mrs. Cantrell on July 20, 2001. Upon examining the report, Dr. Zwemer testified that Mrs. Cantrell's performance was better than he had anticipated. The trial court, however, found that the evaluation likely was not as extensive as other evaluations because Mrs. Cantrell was required to perform the tasks for only one hour. While she was able to perform the physical activities during the hour of the evaluation, Mrs. Cantrell testified that she would be unable to perform those activities for longer than an hour.

Finally, the trial court considered the testimony of Dr. Rodney Caldwell, a vocational expert, who opined that Mrs. Cantrell has a vocational disability of 95%. The trial court, however, expressed doubt with regard to the rating because Dr. Caldwell failed to explain why Mrs. Cantrell would be unable to perform light duty tasks.

Upon reviewing the record, we conclude that the evidence does not preponderate against the trial court's findings and that the record supports the trial court's award of 50% to the left arm and 45% to the right arm. Therefore, the Panel erred in reducing the awards.

■ We further conclude that the trial court and the Panel erred in making separate awards for the loss of each arm. The parties agree that the carpal tunnel syndrome to both of Mrs. Cantrell's arms occurred on the same date. The loss of two arms is a scheduled member injury pursuant to Tennessee Code Annotated section 50–6–207(3)(A)(ii)(w) (1999). Therefore, only one award is required. See Scales v. City of Oak Ridge, 53 S.W.3d 649, 651 n. 1 (Tenn.2001). We average the separate awards and conclude that Mrs. Cantrell is entitled to one award of 47.5% for the loss of two arms. See Lock v. Nat'l Union Fire Ins. Co., 809 S.W.2d 483, 487 (Tenn.1991).

The trial court also awarded compensation for an injury to both shoulders that occurred prior to the carpal tunnel syndrome. The trial court assigned a separate permanent impairment rating of 15.75% to the body as a whole regarding each shoulder. On appeal, the Special Workers' Compensation Appeals Panel modified the trial court's judgment to provide a single award of 31.5% to the body as a whole for the injury to both shoulders. Neither party has requested a review of this award, and we adopt the Panel's modification of the trial court's award.

## CONCLUSION

We conclude that the eight weeks during which Mrs. Cantrell was on a leave of absence must be excluded from the average weekly wage calculation. We further conclude that the record does not preponderate against the trial court's permanent disability award of 50% to the left arm and 45% to the right arm but that the separate

awards should be averaged to equal one award of 47.5% for the loss of two arms. We adopt the findings of the Special Workers' Compensation Appeals Panel with respect to the shoulder injuries, but we reject the Panel's remaining findings. The judgment of the trial court is affirmed in part, modified in part, and reversed in part, and the case is remanded for further proceedings in accordance with this opinion.

Costs of appeal are taxed to the appellant, Carrier Corporation, and its surety, for which execution may issue if necessary.

ADOLPHO A. BIRCH, JR., J., not participating.