**FILED**

**December 12, 2017**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time: 1:30 PM**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT KNOXVILLE

| | |
|---|---|
| **DUWAN DUIGNAN,** ) | **Docket No.: 2017-03-0080** |
| **Employee,** ) | |
| **v.** ) | |
| **STOWERS MACHINERY** ) | |
| **CORPORATION,** ) | **State File No.: 42192-2016** |
| **Employer,** ) | |
| **And** ) | |
| **ZURICH AMERICAN INSURANCE** ) | |
| **COMPANY,** ) | **Judge Pamela B. Johnson** |
| **Carrier.** ) | |

## COMPENSATION HEARING ORDER

This matter came before the undersigned Workers' Compensation Judge on November 15, 2017, for a Compensation Hearing. The central legal issue is whether Duwan Duignan established by a preponderance of the evidence that he is permanently and totally disabled from his June 1, 2016 work injury. If not permanently and totally disabled, then the Court must determine the applicable permanent medical impairment rating and the extent of Mr. Duignan's permanent disability. For the reasons set forth below, this Court holds that Mr. Duignan established by a preponderance of the evidence that he is permanently and totally disabled as a result of the work injury. Accordingly, the Court concludes that Mr. Duignan is entitled to permanent total disability and future medical benefits related to his work injury.

### History of Claim
*Stipulations*

The parties' stipulated facts are summarized as follows: Mr. Duignan is a sixty-one-year-old resident of Loudon County, Tennessee. He completed the twelfth grade and obtained a high school diploma. He worked for Stowers for over thirty-seven years.

On June 1, 2016, Mr. Duignan sustained a work-related injury and gave notice to

1

Stowers. He received authorized medical treatment with Dr. Patrick Bolt, and Stowers paid his medical expenses. Mr. Duignan received temporary disability benefits from June 2, 2016, through July 27, 2016. Mr. Duignan reached maximum medical improvement (MMI) on October 5, 2016. He did not return to work for Stowers or any other employer. His average weekly wage of $1,228.72 entitles him to a weekly compensation rate of $819.15.

*Hearing Testimony*
*Duwan Duigan*

Stowers is a heavy equipment dealer for Caterpillar. At Stowers, Mr. Duignan worked in the warehouse and as a parts delivery driver. The warehouse worker duties required putting up stock, pulling and packaging orders, and performing general customer service and warehouse labor. The delivery driver responsibilities included driving a box truck to/from the customer's location and loading/unloading the parts or components. Mr. Duignan estimated that the various parts weighed from one-half pound to more than 100 pounds. While he performed most lifting manually by hand, he had "buggies" available to place the parts in to move around on the warehouse floor as well as forklifts and other lifting devices available in the warehouse or while out making deliveries.

On June 1, Mr. Duignan picked up a box and felt pressure in his low back while working as a delivery driver. He completed his shift then returned the truck to the warehouse and went home to rest. When he awoke later, he stood and experienced pain down his right leg. His low back pain and right leg pain increased after working his next shift. He went home after that shift and told his wife of his pain and symptoms. He also contacted his supervisor, Greg Chandler, who offered Mr. Duignan medical care. Mr. Duignan declined to drive to Knoxville for evaluation but sought emergency care in Lenoir City.

The following day, Mr. Duignan went to Doctor's care as Stowers instructed. Doctor's Care ordered x-rays, an MRI, and physical therapy and later referred Mr. Duignan to an orthopedist. He selected Dr. Bolt from a panel of physicians. Dr. Bolt did not recommend surgery but instead ordered an epidural steroid injection and functional capacity evaluation. Mr. Duignan decided on his own to use a cane to reduce his low back pain. During this time, Mr. Duignan worked light duty for Stowers performing office work.

After Dr. Bolt released Mr. Duignan at MMI, Mr. Duignan met with Sherry Boynton (human resources manager), Mike Arwood (parts manager), and Harry Breaux (parts department general manager) on three separate occasions to discuss his permanent restrictions and opportunities for him to remain at work for Stowers in his current delivery driver position or to allow him to return to the warehouse with accommodations. Mr. Duignan and Stowers agreed that he could not work as a delivery driver. Stowers offered to return Mr. Duignan to his former warehouse worker position with accommodations. Stowers would not agree to allow Mr. Duignan to use his cane in the accommodated position. Mr.

2

Duignan refused the offer of employment with accommodation due to his concerns over risk of re-injury, the amount of walking required, and the inability to serve customers if working alone. He also refused to work without his cane. Mr. Duignan believed he could not work as a warehouse worker even with accommodation.

Mr. Duignan testified he currently suffers from significant low back pain with occasional pain down his right leg. He has not received treatment for his symptoms since October 2016. He denied taking prescription pain medication but takes over-the-counter pain medication daily. His daily activities are reduced to self-care with pain, light shopping, watching television, and playing on his computer. He is able to drive with breaks on long trips. He admitted he has not applied for any other employment and believes he is unable to work in his current condition.[1]

*Sherry Boynton, Human Resources Manager*

Sherry Boynton served as Human Resources Manager for seventeen years at Stowers. Her responsibilities include acting as a liaison between the carrier, nurse case manager, medical providers, and Stowers managers. She also received return-to-work notes and participated in return-to-work decisions. She, along with Stowers managers, followed the Americans with Disabilities Act interactive process with the goal of returning injured employees to work.

Ms. Boynton testified she received Mr. Duignan's permanent restrictions and informed the General Manager, Harry Breaux, who spoke with Mike Arwood. Together, all three discussed Mr. Duignan's prior delivery driver job and identified other jobs within Stowers, then met with Mr. Duignan on three separate occasions to discuss the options. During the first meeting, all agreed that Stowers could not accommodate Mr. Duignan's restrictions in his prior position of delivery driver. Stowers believed the warehouse worker position was a viable option with accommodations for Mr. Duignan's permanent restrictions. Stowers sought input from Mr. Duignan, but he offered no suggestions and focused on his concerns of re-injury, customer service, and inability to use his cane. Ms. Boynton testified Stowers offered Mr. Duignan a warehouse worker position at a lesser rate of pay with accommodations for lifting assistance and reasonable breaks to sit. Mr. Duignan refused the proposed accommodations and job offer. With no other options, Mr. Duignan's employment ended October 31, 2016.

---

[1] Connie Duignan, wife of Duwan Duignan, also testified. Her testimony generally supported Mr. Duignan's testimony. The Court heard and considered Mrs. Duignan's testimony, but given its similarities to Mr. Duignan's testimony, the Court will not summarize it in its order.

Mr. Duignan came under the care of Dr. Bolt, a board-certified orthopedic surgeon, in July 2016. Dr. Bolt reviewed a recent MRI and examined Mr. Duignan, finding symptoms consistent with a L4-5 small disc protrusion and degenerative changes. Dr. Bolt diagnosed an L4-5 disc herniation with back pain and radiation to the right leg. Mr. Duignan continued to complain of discomfort following physical therapy, so Dr. Bolt recommended an epidural steroid injection (ESI). Mr. Duignan reported relief of leg pain following the ESI but continued to report back pain. Dr. Bolt determined Mr. Duignan was not a surgical candidate and placed him at maximum medical improvement on October 5, 2016.

Dr. Bolt assessed Mr. Duignan's seven-percent permanent medical impairment utilizing the American Medical Association's Guide to the Evaluation of Permanent Impairment, Sixth Edition (AMA Guides). Dr. Bolt referred to the lumbar spine regional grid in table 17-4. He placed Mr. Duignan in class one for intervertebral disc herniation with documented resolved radiculopathy with a default rating of seven percent.[2] After Dr. Bolt's adjustment for functional history and physical modifiers, the net adjustment was zero resulting in seven-percent whole person impairment.

Dr. Bolt additionally ordered a functional capacity evaluation (FCE) in response to Mr. Duignan's concern that his back pain would prevent him from working regular duty. Dr. Bolt reviewed the FCE and adopted its findings as permanent restrictions in the medium physical demand category. Dr. Bolt confirmed Mr. Duignan's FCE demonstrated these deficiencies: carrying fifteen, twenty, and twenty-five pounds; walking twelve feet; balance; climbing stairs; reaching overhead with his left hand; and standing/sitting. Dr. Bolt agreed that Mr. Duignan could not perform these activities on a constant basis and further agreed his permanent restrictions for lifting were a maximum of twenty-six pounds frequently and sixteen pounds constantly. Dr. Bolt testified that, while imperfect, the FCE "is a validated instrument which is used over thousands and thousands of patients and with the expressed purpose of taking my feelings out of it and taking the patient's feelings out of it." (Ex. 6 at 29.)

Dr. Bolt testified canes are rarely recommended in spinal conditions and he saw nothing to indicate Mr. Duignan required an assistive device based upon his FCE results or physical examination. Dr. Bolt did not recommend the use of a cane for Mr. Duignan on a permanent basis, explaining:

He stated it helped him with his back pain. And it literally is a crutch. That's

---

[2] Dr. Bolt originally assigned a six-percent whole person impairment but corrected the rating during the deposition to a seven-percent whole person impairment. Dr. Bolt explained he inadvertently assigned the rating for the cervical spine instead of the lumbar spine.

what we call it. When something becomes a crutch, it become [sic] something that you rely on to get by. And I continue to maintain that is not an ideal situation for someone with back pain. And it is something that he selected, not something that was given to him by his practitioners.

*Id.* at 30.

*Dr. William E. Kennedy*

Dr. William E. Kennedy, a board-certified orthopedic surgeon and independent medical examiner, performed an independent medical examination (IME), at the request of Mr. Duignan's counsel. Before the examination, he reviewed available medical records and diagnostic films. For an hour and a half, Dr. Kennedy interviewed Mr. Duignan about how the injury occurred and ongoing symptoms, performed a physical examination, calculated the permanent impairment, and prepared his report.

In agreeing with Dr. Bolt's diagnosis and findings on the MRI exam, Dr. Kennedy testified the MRI showed a right small foraminal disc herniation at L4. He further testified the MRI findings were consistent with the posttraumatic displacement of disc material at the right L4 level. Dr. Kennedy agreed Mr. Duignan was not a surgical candidate and confirmed MMI of October 5, 2016. He assigned a nine-percent permanent impairment to the whole person. As did Dr. Bolt, Dr. Kennedy relied on table 17-4, page 570, of the AMA Guides for a Class 1 impairment. Dr. Kennedy, however, adjusted the rating up to nine percent based upon functional and physical exam modifiers for pain and symptoms, muscle spasm, and loss of motion. Although reaching a different result, he did not find any flaws with Dr. Bolt's methodology or take issue with Dr. Bolt's treatment protocol or ultimate conclusions.

Dr. Kennedy recommended permanent restrictions to include:

In recognition of his permanent losses of physical function from this injury and in an effort to help him minimize the risk of making the L4 disc segment condition worse, as well as maintain reasonable control of his residual symptoms, I recommend . . . that his activities of daily living and any employment should permanently not require repeated bending, stooping, or squatting, or working over rough terrain or in rough vehicles. He should not attempt to work with his hands elevated above the level of his shoulders. He should not attempt to climb ladders, or work at heights or under conditions such as on his hands and knees or crawling in which his safety and stability would depend on the normal pain-free mobility and strength of his lumbar spine. He should be able to use his cane at all times to help relieve . . . his weight bearing pain . . . Lifting and carrying or pushing and pulling should not exceed 20 pounds occasionally or 10 pounds frequently.

5

(Ex. 1 at 17-18.) Consistent with his recommendations for permanent restrictions, Dr. Kennedy noted Mr. Duignan's FCE showed physical limitations and deficiencies in: walking; carrying fifteen, twenty, and twenty-five pounds; balancing at ten paces; climbing stairs; reaching overhead with his left arm; and standing/sitting. Dr. Kennedy acknowledged that the measured deficiencies may predate the injury, but he assumed the deficiencies are due to the injury because comparison figures before the injury are not available.

While acknowledging that many orthopedic physicians rely on FCEs for assignment of permanent restrictions, he stated he does not and instead takes a prophylactic approach. If the injury is the same to the lumbar spine, then the precautions and restriction should be very similar regardless of other factors such as age, return to work, etc. In turn, Dr. Kennedy disagreed with placement of Mr. Duignan in a medium physical demand as the FCE therapist recommended, stating the medium physical demand would place Mr. Duignan at increased risk of further injury to the L4 disc and of hastening degenerative changes. Dr. Kennedy conceded nothing within the light-duty restrictions he assigned would absolutely prevent Mr. Duignan from being gainfully employed in an occupation that he would be otherwise qualified for and able to perform.

As to Mr. Duignan's use of a cane, Dr. Kennedy agreed canes were rarely prescribed for back pain but stated, "I didn't see any harm in Mr. Duignan using the cane, just as I wouldn't see any harm in his taking an aspirin tablet or a Tylenol tablet to help control his residual pain." *Id.* at 50.

*Mike Galloway, Employee's Vocational Expert*

Mike Galloway conducted a vocational evaluation at the request of Mr. Duignan's counsel. Mr. Galloway reviewed the available records and interviewed Mr. Duignan via telephone on March 15, 2017. He noted Mr. Duignan's high-school education, training in painting and auto body, and possession of a valid Class A commercial driver's license and medical card (renewed February 2016). Mr. Galloway also noted Mr. Duignan's past relevant work history of delivery driver and warehouse worker at Stowers from 1979 to 2016. Mr. Galloway considered the FCE and permanent restrictions that Dr. Bolt adopted and the permanent restrictions that Dr. Kennedy recommended.

Using the labor market access approach, Mr. Galloway identified the types and number of jobs available in Mr. Duignan's local labor market. Mr. Duignan worked at the heavy physical demand in a semi-skilled position prior to the work injury. He had reasonable access to approximately 63,308 unskilled and semi-skilled jobs in the local labor market given his educational and vocational background.

Mr. Galloway determined Mr. Duignan lost access to a substantial number and type of

6

jobs, resulting in seventy-five percent vocational disability based on Dr. Bolt's permanent restrictions, the local labor market, and Mr. Duignan's advanced age, and educational and vocational profile.[3] Considering Mr. Duignan's actual performance in the FCE, Mr. Galloway indicated it is more likely than not that Mr. Duignan will have 100% vocational disability as sedentary unskilled work makes up less than one percent of the local labor market. Mr. Galloway further indicated Mr. Duignan has a 100% vocational disability when considering Dr. Kennedy's permanent restrictions as well as the local labor market, his advanced age, and educational and vocational profile.

When asked about Stowers' offer of accommodation, Mr. Galloway admitted he generally does not take into consideration an employer's ability to offer reasonable accommodations when conducting a vocational assessment. Although unaware of Stowers' job offer with accommodations, Mr. Galloway indicated assistance from coworkers generally does not continue on a long-term, permanent basis. He further indicated a warehouse worker position is difficult to accommodate long-term, as lifting restrictions place a substantial burden on assisting coworkers and the availability of assisting coworker is unknown. He concluded the position was not feasible to perform with assistance of a coworker. Mr. Galloway determined Mr. Duignan was unable to return to work at any of his past positions at Stowers.

*Anthony Enoch, Employer's Vocational Expert*

Anthony Enoch, Stowers' vocational expert, performed a vocational assessment on May 30, 2017, to determine whether gainful employment opportunities are available for Mr. Duignan. Mr. Enoch interviewed Mr. Duignan in-person, considered his educational and vocational background, and administered the Wide Range Achievement and COES Interest Inventory tests. Mr. Enoch also considered the permanent restrictions that Drs. Bolt and Kennedy assigned. After performing a transferable skills analysis, using Mr. Duignan's work history and a medium physical demand, Mr. Enoch identified ten job classifications available to Mr. Duignan. They included driver sales route, fundraiser, demonstrator sewing techniques, tobacco warehouse agent, sales clerk food, driver helper sales route, sales attendant, automobile service station attendant, cashier, and order caller. Mr. Enoch did not identify any available positions when using Dr. Kennedy's permanent restrictions. Mr. Enoch admitted that he did not find job listings for the ten job classifications available in Mr. Duignan's local labor market.

Mr. Enoch also performed a labor market survey. Taking into account Mr. Duignan's educational and vocational background and Dr. Bolt's permanent restrictions, Mr. Enoch

---

[3] Mr. Galloway initially assigned sixty-percent vocational disability based upon Dr. Bolt's adoption of the FCE and medium physical demand. Following Dr. Bolt's deposition and modification of permanent restrictions, Mr. Galloway revised his opinion to seventy-five percent vocational disability.

identified three jobs currently available in the local labor market which include: Papa John's pizza delivery driver, Joyride golf cart driver, and Uber driver. Mr. Enoch testified Dr. Kennedy's restrictions did not exclude these three jobs for Mr. Duignan and determined he is capable of gainful employment in the greater Knoxville labor market. Mr. Enoch admitted he did not consider whether the local job listings were for a W-2 employee or 1099 independent contractor position. He further admitted he did not consider vehicle requirements for delivery driver applicant or the availability of full-time work status.

### Findings of Fact and Conclusions of Law

Mr. Duignan has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions*, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2016) ("[T]he employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence.").

*Permanent Medical Impairment*

The parties stipulated that Mr. Duignan sustained a work-related injury with Stowers. He received authorized medical treatment with Dr. Bolt, whose opinion of Mr. Dunigan's permanent impairment rating shall be presumed to be accurate. This presumption shall be rebuttable only by the presentation of contrary evidence that satisfies a preponderance-of-the-evidence standard. Tenn. Code Ann. § 50-6-204(k)(7).

The Court is presented with conflicting medical opinions on the issue of permanent impairment. Dr. Bolt, the authorized treating physician, determined Mr. Duignan sustained seven-percent impairment. In contrast, the IME physician, Dr. Kennedy, found Mr. Duignan had a nine-percent impairment. Both physicians utilized the same table in the AMA Guides and selected the same class of impairment. The difference in impairment occurred solely due to the physician's assignment of functional and physical exam modifiers. Dr. Kennedy agreed with Dr. Bolt's diagnosis and treatment and did not find any flaws with Dr. Bolt's methodology or ultimate conclusions. The Court holds by a preponderance of the evidence that Dr. Kennedy's opinion failed to rebut the presumption of correctness afforded Dr. Bolt. Accordingly, the Court concludes Mr. Duignan sustained a seven-percent permanent impairment rating.

8

*Permanent Vocational Disability*

Mr. Duignan seeks permanent total disability (PTD) benefits. Tennessee Code Annotated section 50-6-207(4)(B) provides: "When an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled[.]" The assessment of permanent total disability is based upon numerous factors, including the employee's skills and training, education, age, local job opportunities, and the capacity to work at the kinds of employment available in the disabled condition. *Roberson v. Loretto Casket Co.*, 722 S.W.2d 380, 384 (Tenn. 1986). Although a rating of anatomical disability by a medical expert is also one of the relevant factors, "the vocational disability is not restricted to the precise estimate of anatomical disability made by a medical witness." *Henson v. City of Lawrenceburg*, 851 S.W.2d 809, 812 (Tenn. 1993) (citing *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 458 (Tenn. 1988)). In addition, the employee's "own assessment of [his] physical condition and resulting disability is competent testimony that should be considered[.]" *McIlvain v. Russell Stover Candies, Inc.*, 996 S.W.2d 179, 183 (Tenn. 1999).

The Court notes that Mr. Duignan's testimony supports a conclusion that he is unable at this time to work at any occupation. However, the Court finds primary guidance on this issue in the testimony of the vocational experts. Both experts were qualified to testify and explained their methodologies. After reviewing the reports of both experts and hearing their live testimony, the Court finds Mr. Galloway's testimony more persuasive and helpful to the permanent disability analysis. Although Mr. Enoch identified job listings available within Mr. Duignan's restrictions in the local labor market, he failed to delve further to determine whether such listings were feasible considering the nature of the employment relationship, the driver vehicle requirements, and the full- or part-time nature of the job. Also, Mr. Enoch initially said no job classifications were available when considering Dr. Kennedy's restrictions but later changed his opinion and found that the three local job listings fit into Dr. Kennedy's restrictions. In contrast, Mr. Galloway identified the jobs available to Mr. Duignan before the work injury and then determined the jobs remaining after considering his permanent restrictions as well as his educational and vocational background and age. Mr. Galloway's opinion remained steadfast after review of the doctors' depositions and reports.

Giving greater weight to Mr. Galloway's opinion, the Court notes he provided two opinions. First, Mr. Galloway assigned seventy-five-percent vocational disability when considering Dr. Bolt's permanent restrictions. Second, Mr. Galloway assigned 100% disability when considering Mr. Duignan's actual FCE performance or Dr. Kennedy's restrictions. While a presumption of correctness is afforded the authorized treating physician's opinion on causation, reasonable and necessary medical care, and permanent medical impairment, the Court is not aware of any presumption afforded the authorized treating physician's opinion as to permanent restrictions.

9

Here, Dr. Bolt relied upon an FCE in assigning permanent restrictions but acknowledged the FCE was an imperfect instrument. Dr. Kennedy did not utilize the FCE but instead offered a prophylactic approach in assigning his restrictions based upon the type of injury. The FCE determined Mr. Duignan qualified for a medium physical demand, but noted deficiencies in lifting at fifteen, twenty, and twenty-five pounds; walking twelve feet; balancing; and reaching overhead with the left hand. Both doctors agreed the FCE identified these deficiencies based upon Mr. Duignan's actual performance. Accordingly, the Court finds Mr. Duignan's permanent restrictions are those limitations identified in the FCE report reflecting his actual performance.

The Court concludes the preponderance of the evidence demonstrates Mr. Duignan's is permanently and totally disabled, considering the hybrid of sedentary to low-end medium physical demands with lifting and reduced carrying, pushing, and pulling.

Stowers argued that PTD is inappropriate because it offered to return Mr. Duignan to a warehouse worker position with reasonable accommodations for lifting assistance and sitting opportunities. Mr. Duignan countered that he previously worked in the position and knew its physical demands including walking, standing, and lifting. He testified coworkers were not always around to assist, which would require him to leave a customer waiting. He additionally testified Stowers indicated he could not take twenty breaks a day to go sit down. He further explained he did not attempt the accommodated job because he did not want to worsen his condition, which he must live with the rest of his life since surgery is not an option. In weighing the reasonableness of Stowers' job offer and Mr. Duignan's refusal to attempt the job, the Court finds Mr. Duignan's refusal was reasonable based upon his personal knowledge of the job responsibilities and requirements.

The Court holds that the preponderance of the evidence supports a finding that Mr. Duignan is permanently and totally disabled by his work injury. He is therefore entitled to weekly benefits from November 1, 2016, the day following his last day worked, "until [he] is, by age, eligible for full benefits in the Old Age Insurance Benefit Program under the Social Security Act." *See* Tenn. Code Ann. § 50-6-207(4)(A)(i).

*Attorney Fees*

Finally, Mr. Duignan's counsel requested a twenty-percent fee. Before the Court can award an attorney fee in excess of $10,000.00, Tennessee Code Annotated section 50-6-226(a)(2)(C) requires specific findings of the factors set out in Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5, which include:

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

10

2. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

3. The fee customarily charged in the locality for similar legal services.

4. The amount involved and the results obtained.

5. The time limitations imposed by the client or by the circumstances.

6. The nature and length of the professional relationship with the client.

7. The experience, reputation, and ability of the lawyer or lawyers performing the services.

8. Whether the fee is fixed or contingent.

9. Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

10. Whether the fee agreement is in writing.

The Court finds that this case required significant time and expertise on the part of Mr. Duignan's counsel. A fee of twenty percent is statutorily-authorized and customary in cases brought before this Court. Further, the amount is appropriate for successfully shepherding a complicated case through almost a year of litigation, including multiple medical and vocational experts. All the applicable factors, including the experience and ability of Mr. Duignan's attorney, mitigate in favor of the requested fee. Therefore, under Tennessee Code Annotated sections 50-6-207(4)(A)(ii)(a) and 50-6-207(4)(A)(iii), the Court commutes twenty percent of the permanent total disability benefits for Mr. Duignan's attorney's fee in the amount of $51,723.47.

Additionally, Tennessee Code Annotated section 50-6-207(4)(A)(ii)(c) provides:

After the total amount of the commuted lump sum is determined, the amount of the weekly disability benefit shall be recalculated to distribute the total remaining permanent total benefits in equal weekly installments beginning with the date of entry of the order and terminating on the date the employee's disability benefits terminate pursuant to subdivision (4)(A)(i).

Mr. Duignan will be eligible for full benefits in the Old Age Insurance Benefit Program on November 26, 2022. The period of November 1, 2016, to November 26, 2022,

totals 315 weeks and five days, which at the agreed compensation rate totals $258,617.35 in PTD benefits. Reducing that amount by the attorney fee of $51,723.47 yields an adjusted total benefit of $208,893.88, which divided by 315 weeks equals an adjusted weekly compensation rate of $656.81. Stowers shall pay Mr. Duignan's PTD disability benefits at this rate. It shall also pay accrued benefits for the period of November 1, 2016, through the date of this Order in a lump sum.

**IT IS, THEREFORE, ORDERED** as follows:

1. Stowers and/or its carrier shall provide Mr. Duignan with medical treatment for his work injuries under Tennessee Code Annotated section 50-6-204. Dr. Bolt remains the authorized treating physician.

2. Stowers and/or its carrier shall pay Mr. Duignan a lump sum of fifty-eight weeks of benefits, totaling $38,094.98, in satisfaction of the PTD benefits accruing between November 1, 2016, and the date of the issuance of this order.

3. Stowers and/or its carrier shall pay ongoing PTD benefits on a weekly or bi-weekly basis until Mr. Duignan is eligible for full Old Age Social Security retirement benefits and his permanent total disability award is paid in full.

4. Mr. Duignan's counsel shall be paid a twenty-percent attorney fee, or $51,723.47, in a lump sum.

5. Stowers shall prepare and file a statistical data form within ten business days of the date of this order under Tennessee Code Annotated section 50-6-244.

6. The filing fee for this this cause is taxed to Stowers under Rule 0800-02-21-.07 (2016) of the Tennessee Compilation Rules and Regulations.

7. Absent an appeal of this order by either party, the order shall become final thirty days after issuance.

**ENTERED December 12, 2017.**

**PAMELA B. JOHNSON, JUDGE**
**Court of Workers' Compensation Claims**

12

**APPENDIX**

Technical Record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Scheduling Hearing
4. Scheduling Hearing Order
5. Notice and Order of Nonsuit of the Subsequent Injury Fund Only
6. Employer/Carrier's Pre-Compensation Hearing Statement and Witness/Exhibit List
7. Employer/Carrier's Trial Brief
8. Employee's Pre-Compensation Hearing Statement
9. Employee's Motion in Limine
10. Employee's Pre-Trial Brief
11. Employer/Carrier's Response to Motion in Limine
12. Employer/Carrier's Motion to Strike Employee's Trial Brief
13. Employee's Response to Motion to Strike
14. Post-Discovery ADR Dispute Certification Notice

The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

Exhibits:
1. Dr. William Kennedy's Deposition with attached exhibits
2. Mike Galloway's Vocational Assessment Report
3. Mike Galloway's Addendum to Vocational Assessment Report
4. Stowers' Accommodation Request form (Driver I, grade 11)
5. Stowers Accommodation Request Form (Warehouse Associate II, grade 8)
6. Dr. Patrick Bolt's Deposition with attached exhibits
7. Separation Notice
8. Documents submitted by Employer to TDOL regarding Separation
9. Stowers ADA Interactive Process Notes
10. Email from Sherry Boynton and Rhoe Saporito
11. Notice of Disciplinary Action
12. Employer's Responses to Request for Admissions
13. Employer's Responses to Interrogatories
14. *(Marked for Identification Purposes Only)* Social Security Administration Documents
15. Anthony Enoch's Initial Rehabilitation Report
16. Anthony Enoch's Vocational Results Report No. 3 with attachments

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on December 12, 2017.

| Name | Certified Mail | Fax | Email | Service sent to: |
|---|---|---|---|---|
| Link A. Gibbons, Employee's Attorney | | | X | link@linkgibbonslaw.com |
| G. Gerard Jabaley Employer's Attorney | | | X | gjabaley@wimberlylawson.com |

**PENNY SHRUM, COURT CLERK**
**wc.courtclerk@tn.gov**

14