**FILED**

**May 4, 2018**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time: 4:25 P.M. EASTERN**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT KNOXVILLE

| | |
|---|---|
| **KENNETH M. WRIGHT,** ) | **Docket No. 2016-03-0663** |
| **Employee,** ) | |
| **v.** ) | |
| **NATIONAL STRATEGIC** ) | **State File No. 86190-2014** |
| **PROTECTIVE SERVICES, LLC,** ) | |
| **Employer,** ) | |
| **And** ) | |
| **STARR INDEMNITY AND LIABILITY** ) | **Judge Lisa A. Lowe** |
| **CO.,** ) | |
| **Carrier.** ) | |

---

## COMPENSATION HEARING ORDER

---

This matter came before the Court for a Compensation Hearing on April 18, 2018. The parties stipulated Mr. Wright sustained a work-related injury on September 19, 2014. The disputed issues are: (1) the appropriate permanent impairment rating, and (2) whether Mr. Wright is entitled to his original award, increased benefits, extraordinary relief, or permanent total disability benefits. For the reasons below, this Court holds Mr. Wright established by a preponderance of the evidence that his appropriate impairment rating is 24% to the body as a whole and he is entitled to extraordinary relief.

### History of Claim

Mr. Wright worked in Department of Energy security services for various contractors for almost thirty years; National Strategic Protective Services (NSPS) held the contract for the last five years. Mr. Wright's stipulated compensation rate for permanent disability benefits is $848.00 per week.

As part of his employment, NSPS required physical fitness tests and weapons qualification. During a weapons qualification on September 16, 2014, Mr. Wright injured his neck after pulling on his bullet-proof vest, resulting in immediate pain. Mr. Wright

1

completed the weapons qualification, but he experienced intense pain in his neck and down his right arm the next day. He initially treated with his family doctor, but he gave NSPS notice of the injury after continuing to experience pain. NSPS provided a panel, and Mr. Wright selected chiropractor Charles David Roberts. While treating with D.C. Roberts, Mr. Wright experienced new symptoms consisting of an "electrical shock" feeling, leaking urine, and rib pain. Upon completion of chiropractic treatment, Mr. Wright asked NSPS for additional medical treatment, and it authorized treatment with board-certified neurosurgeon Dr. David Hauge without providing a panel.

*Medical Treatment*

Mr. Wright received treatment from four doctors: Hauge, Wiles, Bolt, and Scariano, all of whom testified by deposition.

Dr. Hauge diagnosed a large right-sided disc herniation at C5- 6/C6-7 and ultimately performed discectomy and fusion surgery. Following surgery, Mr. Wright developed head-jerking symptoms that Dr. Hauge described as sudden temporary pain syndrome. Dr. Hauge attributed the head-jerking to some type of unidentified problem in the spinal cord and related it to the work injury. Mr. Wright underwent a nerve conduction study (NCS), which revealed right C6 and C7 radiculopathy. During his treatment, Dr. Hauge noted Mr. Wright exhibited cog-wheeling[1] motion of the upper extremity. Dr. Hauge explained cog-wheeling might be a sign of Parkinson's disease or a tremor-type syndrome. Mr. Wright underwent a functional capacity evaluation (FCE), which indicated capability for medium-level work. However, due to the cog-wheeling symptoms, Dr. Hauge restricted Mr. Wright to sedentary work. Dr. Hauge placed Mr. Wright at maximum medical improvement (MMI) on April 25, 2016, and assigned a rating of 24% impairment for a two-level fusion with residual radiculopathy. Dr. Hauge executed a physician-certification form stating that Mr. Wright was unable to perform his pre-injury occupation.

Dr. David Wiles provided a second-opinion evaluation and noted that Mr. Wright's cervical radiculopathy largely resolved after surgery with only a small radiculopathy remaining between the shoulder blades. Dr. Wiles did not assign an impairment rating but when asked during his deposition, he stated with no documented radiculopathy, he would put Mr. Wright in the upper end of Class 2 with a range of 9-14%. He also stated that if Mr. Wright had an EMG/NCS that showed radiculopathy, he would use Class 3 with a range of 15-24%. Finally, Dr. Wiles testified that he thinks Mr. Wright's head-jerking symptoms are brain-related rather than spinal cord-related.

---

[1] Dr. Hauge described "cog-wheeling" as an abnormal muscle motion where instead of the muscle moving smoothly, it ratchets like a socket wrench.

NSPS obtained an independent medical evaluation with board-certified orthopedic physician Dr. Patrick Bolt. Dr. Bolt did not relate Mr. Wright's cog-wheeling or head-jerking to the work injury. However, he did think Mr. Wright's gait difficulty was at least 50% related to the work injury and included it in his impairment assessment. Dr. Bolt noted no symptoms of active radiculopathy at the time of his exam and agreed with the FCE placement of medium-level duty. Dr. Bolt assigned a 15% impairment rating.

Mr. Wright also sought unauthorized treatment with Dr. Jack Scariano. Dr. Scariano thought the radiculopathy on the NCS was permanent and related the shocking sensation Mr. Wright experienced to the work injury. He did not assign an impairment rating but indicated he agreed with Dr. Hauge's rating. Dr. Scariano diagnosed Mr. Wright with Parkinson's disease, not related to the work injury. He also thought Mr. Wright should not lift more than five pounds due to the work injury. Dr. Scariano stated he did not think Mr. Wright would be reliable for work activities on a sustained and regular basis due to his neck problems and the shocking sensation.

### Lay Testimony

Mr. Wright testified as to his current symptoms. He stated if he turns his head or looks up or down too much, his head jerks, which is distracting and painful. If anything presses on his mid-back, he gets the electrical shock feeling. He said he still has pain in his right arm down to his fingers and from his left arm to his tricep, with a feeling of numbness and weakness. If he lifts objects, his throat gets numb and his voice sounds raspy. He indicated he has trouble walking. Mr. Wright testified he has not returned to any type of employment and does not think any job exists that he could perform.

NSPS Chief Barry Collins testified that his position is an example of an unarmed administrative position that Mr. Wright could perform. He also stated Mr. Wright could be a CAS operator because it is an unarmed position involving alarm monitoring and dispatch. However, Chief Collins admitted no CAS operator positions were available at the time of Mr. Wright's release. Chief Collins stated Net Gain performs physicals and evaluations for NSPS, which found Mr. Wright "permanently disqualified" for duty following its May 4, 2016 assessment.

### Vocational Assessment

Mr. Wright underwent a vocational evaluation with Dr. Craig Colvin, who reviewed medical records and depositions, and conducted an in-person interview. Based on Dr. Hauge's sedentary restrictions, Dr. Colvin initially opined that Mr. Wright sustained 90% percent vocational disability. However, he ultimately concluded Mr. Wright was 100% vocationally disabled due to the drastic effect of Mr. Wright's injury and restrictions on his activities of daily living. Dr. Colvin did not perform any testing or consult any database.

3

Instead, he relied on his fifty years of experience and education. Dr. Colvin did not consider Dr. Bolt's opinion about medium-level duty but testified if he had utilized medium-level restrictions, Mr. Wright would be between 35% and 40% vocationally disabled. Finally, Dr. Colvin stated Mr. Wright would be unable to perform medium-duty work due to his gait problems related to the work injury.

NSPS conducted its own vocational evaluation with Patsy Bramlett, who has forty years of experience as a vocational consultant. Ms. Bramlett reviewed medical records and depositions, interviewed Mr. Wright, performed testing and a transferability-of-skills analysis, and created a vocational profile. Based on the FCE medium-level restrictions adopted by Dr. Bolt, she opined Mr. Wright is 37% vocationally disabled. Ms. Bramlett did not take Mr. Wright's gait issues into consideration, indicating she thought Dr. Bolt took that into consideration when he assigned medium-level duty. Ms. Bramlett stated employees must stand six to eight hours per day for medium-level jobs and must stand up to six hours per day for non-skilled light-duty jobs, although some light-duty jobs don't require standing for six hours. She testified if she used the sedentary restrictions, Mr. Wright's vocational disability would be 80 to 90%.

## Findings of Fact and Conclusions of Law

Mr. Wright has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions*, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2017).

*Permanent Medical Impairment*

The Court faces conflicting medical opinions from Dr. Hauge and Dr. Bolt on the degree of permanent impairment. A trial judge "has the discretion to conclude that the opinion of one expert should be accepted over that of another expert." *Reagan v. Tennplasco*, No. M2005-02020-WC-R3-CV, 2006 Tenn. LEXIS 1209, at *10 (Tenn. Workers' Comp. Panel Dec. 27, 2006). As stated by the Tennessee Supreme Court, "[w]hen faced . . . with conflicting medical testimony . . . it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Thomas v. Aetna Life and Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991) (internal quotation marks omitted).

Dr. Bolt only saw Mr. Wright once, for forty-five minutes to one hour, before assigning the 15% impairment rating. He related at least 50% of Mr. Wright's gait/balance issues to the work injury and included it in his impairment assessment. Dr. Bolt testified if

4

Mr. Wright underwent another FCE now, he would not score as well as the first one particularly regarding balance or walking. However, Dr. Bolt did not address how Mr. Wright's gait issues would affect his ability to work at medium-level duty.

In contrast, Dr. Hauge treated Mr. Wright for over one year and performed surgery. He conducted post-surgical NCS and considered the results in his impairment assessment because Mr. Wright's chronic radiculitis may affect some function long-term and Mr. Wright's testimony confirmed he still experiences symptoms of radiculopathy. Dr. Hauge noted if Mr. Wright's NCS had been normal, his rating would have been lower.

Drs. Wiles' and Scariano's testimony bolsters Dr. Hauge's opinion. Dr. Wiles similarly stated with no documented radiculopathy, he would put Mr. Wright in the upper end of Class 2 with a range of 9-14%, but if Mr. Wright had an EMG/NCS that showed radiculopathy, he would use Class 3 with a range of 15-24%. Dr. Scariano also thought Mr. Wright's radiculopathy was permanent and agreed with Dr. Hauge's impairment rating.

Based on the treatment provided by Dr. Hauge, the post-surgery NCS, and the support of Drs. Wiles' and Scariano's opinions, the Court places greater weight on Dr. Hauge's opinion and holds Mr. Wright sustained a permanent impairment of 24% to the whole person.

*Permanent Vocational Disability*

Mr. Wright seeks permanent total disability benefits. Tennessee Code Annotated section 50-6-207(4)(B) provides: "When an injury . . . totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled[.]" The assessment of permanent total disability is based upon numerous factors, including the employee's skills and training, education, age, local job opportunities, and the capacity to work at the kinds of employment available in the disabled condition. *Roberson v. Loretto Casket Co.*, 722 S.W.2d 380, 384 (Tenn. 1986). Although a rating of anatomical disability by a medical expert is also one of the relevant factors, "the vocational disability is not restricted to the precise estimate of anatomical disability made by a medical witness." *Henson v. City of Lawrenceburg*, 851 S.W.2d 809, 812 (Tenn. 1993) (citing *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 458 (Tenn. 1988)). In addition, the employee's "own assessment of [his] physical condition and resulting disability is competent testimony that should be considered[.]" *McIlvain v. Russell Stover Candies, Inc.*, 996 S.W.2d 179, 183 (Tenn. 1999).

Mr. Wright's case is complicated by the fact that he unfortunately began exhibiting symptoms of early Parkinson's disease following his neck surgery. The physicians seem to agree that if Mr. Wright underwent another FCE, he would not do as well as he did on the first. However, even utilizing the sedentary restrictions, Dr. Colvin initially assessed Mr. Wright's vocational disability at 90%, and Ms. Bramlett said 80-90%. The Court is not

bound to choose either option and could consider additional testimony and conclude that Mr. Wright is permanently and totally disabled.

However, the Court finds that, while his employment options are significantly limited, they are not totally limited. The Court holds Mr. Wright did not establish by a preponderance of the evidence that his neck injury *totally* incapacitated him from working at *any* job that brings an income. Thus, the Court denies Mr. Wright's claim for permanent total disability benefits.

*Permanent Partial Disability Benefits*

Since Mr. Wright is not entitled to permanent total benefits, the Court must determine the extent of permanent partial disability (PPD) benefits to which he is entitled. The assessment of the extent of appropriate PPD benefits occurs at two different times. The first assessment takes place once the treating physician places the injured employee at MMI and assigns an impairment rating. Mr. Wright's original award is $91,584.00.[2]

The second assessment of PPD benefits occurs at the expiration of the initial compensation period. Mr. Wright's initial compensation period expires on May 21, 2018. *See* Tenn. Code Ann. § 50-6-207(3)(B). The award provided by section 50-6-207(3)(B) is known as the resulting award. Using the applicable factors here, the Court holds Mr. Wright is entitled to increase his original award based on his inability to return to work (1.35) and his age (1.2). NSPS did not refute that Mr. Wright qualifies for the inability-to-return-to-work multiplier, since he was unable to return to work at the time of the hearing and will remain unable to do so when the initial compensation period expires on May 21. Because Mr. Wright is sixty-one, the age multiplier also applies. Mr. Wright established by a preponderance of the evidence his entitlement to a resulting award of $56,782.08 after applying the no-return-to-work and age multipliers.

However, instead of a resulting award, Mr. Wright seeks extraordinary relief under Tennessee Code Annotated section 50-6-242(a), which allows the Court to increase an employee's original award of PPD benefits above those provided in section 50-6-207(3) if the employee establishes by clear and convincing evidence that limiting the employee's recovery would be inequitable in light of the totality of the circumstances and that the following facts are shown:

1.    The employee's impairment rating is 10% or higher;
2.    The authorized treating physician has certified on a Bureau form that the employee no longer has the ability to perform his pre-injury

---

[2] 450 x 24%=108 weeks x $848.00=$91,584.00. At the hearing, the parties stipulated NSPS paid Mr. Wright 103 weeks of his original award for a total of $87,344.00, for which it would receive a credit.

occupation due to permanent restrictions caused by the work injury; and

3. The employee is earning less than 70% of his pre-injury average weekly wage or salary.

Tenn. Code Ann. 50-6-242(a)(2).

The Court first addresses whether Mr. Wright established by clear and convincing evidence that limiting his recovery would be inequitable in light of the totality of the circumstances. The Court holds that he has established this for the following reasons.

Mr. Wright remains under significant restrictions due to his work-related injury. Dr. Hauge assigned sedentary duty but considered the non-work-related "cog-wheeling" in his assessment. Dr. Bolt adopted medium-level restrictions but acknowledged if he were to undergo another FCE, he would not do as well with regard to balance and walking. Dr. Bolt did not address how Mr. Wright's work-related gait issues would affect his ability to perform medium-duty work. Ms. Bramlett testified a person working medium level would be required to stand for six to eight hours, and with Mr. Wright's gait and balance issues, the Court finds Mr. Wright unlikely to do so. The Court surmises Mr. Wright's work capabilities, considering his work-related conditions, fall somewhere *between* medium and sedentary. Based on the vocational testimony that Mr. Wright's vocational disability falls somewhere between 37% and 90%, the Court assesses Mr. Wright's vocational disability to be between 60% and 65%. Limiting Mr. Wright to the original and resulting awards equates to approximately 38.9% PPD benefits. Thus, the Court finds, in light of the totality of the circumstances, Mr. Wright provided clear and convincing evidence that limiting his recovery to benefits under 50-6-207(3)(B) would be inequitable.

Having made this determination, the Court turns to the additional factors of 50-6-242(a)(2): impairment exceeding 10%, physician's certification, and earning less than 70% of pre-injury average weekly wage. Mr. Wright established by a preponderance of the evidence that both Drs. Hauge and Bolt assigned an impairment rating of greater than 10%.

Likewise, Dr. Hauge signed the physician certification form, which is afforded a presumption of correctness, shifting the burden to NSPS to prove, by "contrary clear and convincing evidence," that Mr. Wright has the ability to perform his pre-injury occupation. *See Batey v. Deliver This,* 2018 TN Wrk. Comp. App. Bd. LEXIS 2, at *13 (Feb. 6, 2018).

Mr. Wright's pre-injury occupation consisted of Department of Energy security services. NSPS Chief Collins testified Mr. Wright could perform his job as chief or a CAS operator yet acknowledged Net Gain determined Mr. Wright permanently disqualified. The Court discredits Chief Collins' testimony due to the inconsistency. Similarly, Ms. Bramlett testified Mr. Wright could perform medium-duty work but did not consider his gait difficulty

7

or head-jerking. The Court holds that NSPS failed to offer clear and convincing evidence to rebut the presumption of correctness afforded Dr. Hauge's opinion that Mr. Wright can no longer perform his pre-injury occupation.

Additionally, NSPS did not rebut Mr. Wright's testimony that he has not worked since his release by Dr. Hauge. Thus, Mr. Wright established by a preponderance of the evidence that he is not earning an average weekly wage or salary greater than 70% of his pre-injury wage.

For these reasons, the Court awards Mr. Wright 275 weeks of PPD benefits under section 50-6-242.[3] At the time of the Compensation Hearing, NPS paid Mr. Wright 103 weeks of benefits, which leaves a balance of 172 weeks.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Wright is entitled to 275 weeks of permanent partial disability benefits. NSPS previously paid Mr. Wright 103 weeks of benefits. NSPS or its carrier shall pay Mr. Wright the remaining balance of 172 weeks of benefits at $848.00 per week.

2. Mr. Wright is entitled to future medical benefits under Tennessee Code Annotated section 50-6-204(a)(1)(A). Dr. Hauge shall remain the authorized treating physician.

3. Mr. Wright's attorney's fees will exceed $10,000.00. Therefore, Mr. Wright's attorney shall file an application for approval of fees outlining the factors identified in Tennessee Supreme Court Rule 8, Rules of Professional Conduct 1.5. *See* Tenn. Code Ann. 50-6-226(2)(C).

4. NSPS shall pay the $150.00 filing fee under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2016) directly to the Court Clerk within five business days of the date of this order, for which execution may issue if necessary.

5. NSPS shall file a Statistical Data form (SD-2) within ten business days of entry of this order.

6. Absent an appeal, this order shall become final thirty calendar days after entry.

**ENTERED on May 4, 2018.**

---

[3] An award of 275 weeks of benefits equates to 61% whole-body disability.

8

_Lisa A. Lowe_ (signature)

**LISA A. LOWE, JUDGE**
**Court of Workers' Compensation Claims**

## APPENDIX

Technical record:

1) Petition for Benefit Determination
2) Dispute Certification Notice
3) Agreed Stipulation of Dr. David Hauge Deposition for Proof
4) Notice of Filing Deposition of David H. Hauge, M.D.
5) Notice of Filing of Deposition of Jack E. Scariano, Jr., M.D.
6) Notice of Filing Deposition of Patrick M. Bolt, M.D.
7) Employee's Trial Exhibit List
8) Employee's Witness List
9) Employee's Prehearing Brief
10) Employer's Compensation Hearing Brief
11) Employer's Proposed Stipulations
12) Employers' Witness and Exhibit List
13) Notice of Filing of Physician Certification Form
14) Post ADR Dispute Certification Notice
15) Motion to Strike and Exclude
16) Employee's Pre-Hearing Statement
17) Notice of Filing Report of Craig R. Colvin, ED.D
18) Order of Continuance
19) Motion to Exclude
20) Employee's Objection and Response to Motion to Exclude
21) Employer's Reply to Employee's Response to Employer's Motion to Exclude Order Denying Motion to Exclude

Stipulated Findings of Facts of the Parties:
- Mr. Wright sustained a work-related injury on September 19, 2014.
- Mr. Wright timely reported his injury of September 19, 2014.
- Mr. Wright is entitled to the state maximum compensation rate of $932.80 per week for temporary disability benefits and $848.00 per week for permanent disability benefits.
- National Strategic Protective Services, LLC paid for all medical benefits to which Mr. Wright is entitled.
- Mr. Wright reached MMI on April 25, 2016, as assigned by authorized treating physician, Dr. David Hauge.

- Mr. Wright and NSPS agree to the admissibility and entry of the deposition of Dr. David Hauge taken November 3, 2016, as a deposition for proof.

Stipulated Conclusions of Law of the Parties:
- This claim is governed by the Workers' Compensation Law for the state of Tennessee.
- Mr. Wright provided proper, statutory notice of the alleged injury to NSPS.
- Mr. Wright filed his Petition for Benefit Determination within the applicable statute of limitations.

Exhibits:
1. Deposition Transcript and Exhibits of Dr. David Hauge
2. Deposition Transcript and Exhibits of Dr. Patrick Bolt
3. Deposition Transcript and Exhibits of Dr. Jack Scariano
4. Physician Certification Form of Dr. David Hauge
5. Vocational Report of Dr. Craig Colvin
6. NSPS/NetGain May 4, 2016 record

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on May 4, 2018.

| Name | Certified Mail | Fax | Email | Service sent to: |
|---|---|---|---|---|
| John D. Agee, Amanda Lowe, Employee's Attorney | | | X | jda@ridenourlaw.com <br><br> alowe@ridenourlaw.com |
| Christopher W. Sherman, Employer's Attorney | | | X | cwsherman@mijs.com |

PENNY SHRUM, COURT CLERK
wc.courtclerk@tn.gov