**FILED**
**Sep 03, 2019**
**09:30 AM(ET)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT KNOXVILLE

| | | |
|---|---|---|
| **ROSEANNE AMENDOLIA,** | ) | **Docket No. 2018-03-0307** |
| **Employee,** | ) | |
| **v.** | ) | |
| **EMORY VALLEY CENTER, INC.,** | ) | **State File No. 46361-2017** |
| **Employer,** | ) | |
| **And** | ) | |
| **BRIDGEFIELD CASUALTY** | ) | **Judge Pamela B. Johnson** |
| **INSURANCE CO.,** | ) | |
| **Carrier.** | ) | |

---

## COMPENSATION ORDER

---

This case came before the Court for a Compensation Hearing on July 30, 2019.[1] The issue is whether Ms. Amendolia proved by a preponderance of the evidence that she is entitled to permanent total disability benefits or, alternatively, an original award of permanent partial disability.[2] For the reasons below, the Court denies her claim for permanent total disability but grants her claim for an original award of permanent partial disability.

### History of Claim
*Stipulations*

Ms. Amendolia worked for Emory Valley when she allegedly injured her low back

---

[1] At the start of the hearing, the Court denied Emory Valley's Motion Requesting Scheduling Hearing and Continuance of Compensation Hearing, finding that the issues of permanent total disability or an original award of permanent partial disability were ripe. The Court next denied Ms. Amendolia's motion to exclude Dr. Koenig's testimony and Emory Valley's motion to exclude Dr. Colvin's testimony. The Court granted in part and denied in part Emory Valley's motion to exclude Ms. L'heureux's testimony, limiting her testimony to her knowledge of Ms. Amendolia's 2011 back complaints and current condition.

[2] Ms. Amendolia alternatively claimed entitlement to extraordinary relief or increased benefits. The parties acknowledged these benefits were not ripe until the initial compensation period expired.

and neck on June 19, 2017. At the time of the work incident, her earnings resulted in a workers' compensation rate of $346.78 per week.

Emory Valley provided authorized treatment for her low back with panel-selected physician Dr. Cletus McMahon. He diagnosed a left L3-4 herniated disc and a L4-L5 spinal stenosis and performed low-back surgery. Ms. Amendolia also received authorized treatment for her neck from panel-selected physician Dr. Patrick Bolt, who placed her at maximum medical improvement (MMI) on April 16, 2018.

*Disputed Issues*

The parties disputed the causal relationship of Ms. Amendolia's L4-L5 spinal stenosis to her work, the degree of permanent medical impairment caused by her work injury, and the extent of her permanent disability.

**Hearing Testimony**
*Prior Low-Back Complaints*

Addressing the cause of Ms. Amendolia's L4-L5 spinal stenosis, the parties focused their proof in part on her prior low-back complaints. In July 2011, Ms. Amendolia traveled to visit her daughter, Jessica L'heureux. During the visit, Ms. Amendolia developed low-back muscle spasms and "sciatica." She went to the emergency room twice and treated with muscle relaxers. She testified the pain came on suddenly and resolved a few days later. She extended her visit but ultimately drove home and returned to work. Ms. L'heureux confirmed Ms. Amendolia's description of her 2011 complaints.

Ms. Amendolia denied further treatment for her low-back complaints when she returned home.[3] However, the medical proof showed she treated with Dr. Pandurang Miskin in August 2011, reporting "sudden onset of severe back pain radiating to the left lower extremity." She described the pain as "excruciating," and it continued after her return. Dr. Pandurang diagnosed lumbar radiculopathy and ordered an MRI, which showed mild-to-moderate multilevel degenerative and disc and facet changes with varying degrees of central stenosis and neural foraminal narrowing.

*Work Injury, Medical Treatment, and Impairment*

Turning to the work injury, Ms. Amendolia assisted cognitively- and developmentally-disabled adults. On June 19, 2017, a falling resident pulled her to the

---

[3] Ms. Amendolia denied any prior problems with her low back, left leg, and neck in the history she provided for the 2017 treatment. In her discovery responses and deposition, she admitted that she sought treatment for her low back at an emergency room in Tennessee in 2011. During the hearing, she explained she "honestly forgot about it."

ground. Ms. Amendolia twisted her knee, felt a pop in her back, and had neck pain.

That same day, she went to the emergency room. A few days later, she went to a walk-in clinic. There, the provider sent her to physical therapy and referred her to specialists for her neck and low back.

In response to the referrals, Emory Valley provided Ms. Amendolia with panels. She selected Dr. McMahon for her back and Dr. Bolt for her neck.

Dr. McMahon, a board-certified orthopedic surgeon, saw Ms. Amendolia for low back and left leg pain. He reviewed a July 14, 2017 MRI, which showed a left L3-L4 herniated disc compressing on the L4 nerve root and significant L4-L5 spinal stenosis compressing the L5 nerve root. He performed surgery and removed the L3-L4 herniated disc. On February 15, 2018, Dr. McMahon placed Ms. Amendolia at MMI for her low back and assigned a 23% whole-person impairment rating. He noted that she had lower-back pain radiating into her left leg and numbness in her third and fourth toe on the left side. He also recommended that she "no longer do [her] type of work."

Later, Dr. McMahon responded to a questionnaire from Ms. Amendolia's counsel. Counsel asked whether her 2017 accident "aggravated and advanced a preexisting condition, and if so, [(1)] whether the accident contributed more than 50 percent in causing the aggravation, and (2) whether the work accident was the cause of the aggravation more likely than not, considering all causes." He answered "yes," stating "it 'aggravated the spinal stenosis and caused the HNP,' herniated disc."

Dr. McMahon also addressed Ms. Amendolia's 2011 low-back complaints. He testified, "[S]he told me she had no prior problems." Before his deposition, Dr. McMahon reviewed the 2011 medical records and compared the 2011 and 2017 MRIs. When asked about the 2011 complaints of low-back pain radiating into her leg, Dr. McMahon stated the only significance was the indication that Ms. Amendolia experienced sciatica in the left leg. However, he confirmed that she was able to continue working with her 2011 low-back complaints, but she was unable to work with her 2017 symptoms. Dr. McMahon testified that he did not see any difference between the two MRIs. Specifically, he saw no difference in the *severity* on the left L4-L5 neural foraminal narrowing, but he acknowledged "varying, different ways to interpret [the MRI]." (Emphasis added).

Dr. McMahon ultimately concluded Ms. Amendolia's 2017 work accident caused the L3-L4 herniated disc and aggravated her L4-L5 spinal stenosis. He testified the new knowledge of Ms. Amendolia's 2011 back complaints did not affect his causation opinion. He said that her history "just [tells] me she had some prior back pain, but she was working evidently in the six years prior to me seeing her until she had this injury."

3

He assigned a 23% permanent whole-person impairment using the sixth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment (AMA Guides). He explained:

> Again, as you know, these are just simply guidelines to give us an idea, and I felt best (sic) upon the Table 17-4 on page 570 of the sixth edition that she had a 23 percent permanent physical impairment to the body as a whole based upon the findings on the page, primarily under Class 3. . . . *Primarily a herniated disc and documented residual radiculopathy, which she has.* And it rates that as anywhere from 15 to 23, and I gave her 23 percent.

(Emphasis added.)

Dr. McMahon stated that he considered both the L3-L4 herniated disc and the L4-L5 spinal stenosis when arriving at the impairment rating, explaining, "I primarily combined them. I think the max was 23 percent." On cross-examination, he admitted that he did not use the Pain Disability Questionnaire or the Clinical Studies Adjustment sections in the AMA Guides.

He recommended permanent restrictions of no lifting over ten pounds. He signed the Physician Certification Form, finding that "due to permanent restrictions on activity [she] has suffered as a result of the injury[,] [Ms. Amendolia] no longer has the ability to perform [her] pre-injury occupation." He confirmed that while Ms. Amendolia cannot perform her pre-injury occupation, she can perform other jobs within her restrictions.

Dr. Bolt, a board-certified orthopedic surgeon, saw Ms. Amendolia for neck pain and headaches. He diagnosed work-related neck sprain/strain and non-work-related cervical spondylosis, which he described as arthritis and/or degenerative changes of the cervical spine. He treated her conservatively with physical therapy, anti-inflammatory medication, and injections. He confirmed the neck MRI showed no acute injury and that the injections were placed at the levels where she had cervical spondylosis. However, he reiterated that Ms. Amendolia "sustained a cervical sprain/strain, and also to some extent aggravated her cervical spondylosis." He maintained that the need for injections was due to the work injury.

Dr. Bolt placed Ms. Amendolia at MMI on April 16, 2018. Using the AMA Guides, Dr. Bolt assigned a 2% permanent whole-person impairment. He placed her in Class 1 for her cervical strain and did not apply any modifiers because "it was my opinion that no modifiers were applicable due to the lack of objective findings." He permanently restricted her from prolonged cervical flexion or extension, which meant more than 33% of the workday. He confirmed that she is capable of working in a job that does not require her to hold her neck in a prolonged extended or flexed position.

4

Emory Valley sent Ms. Amendolia for an employer's examination with Dr. Thomas Koenig, who is a board-certified orthopedic surgeon and senior disability analyst, and a Bureau Medical Impairment Rating Registry physician. Dr. Koenig compared the 2011 and 2017 MRIs, finding both showed multilevel degenerative disc disease, facet changes, and stenosis throughout multiple levels of the lumbar spine. He noted the difference is a L3-L4 disc herniation on the 2017 MRI that was not present on the 2011 MRI. He also reviewed the 2011 EMG study that shows left L5-S1 radiculopathy.

Dr. Koenig testified that, secondary to the 2017 work incident, Ms. Amendolia sustained a L3-L4 disc extrusion, lumbosacral strain, cervical strain without evidence of radiculopathy, and possible malingering. He calculated her work-related permanent impairment using the AMA Guides.

For her low back, he placed her in a Class 1 category for her L3-L4 disc herniation using Table 17-4 on page 570. Applying the adjustments for the modifiers, Ms. Amendolia maintained a default grade C impairment, which correlated to 7% permanent whole-person impairment. On cross-examination, Dr. Koenig indicated that the AMA Guides provide a minimum impairment of 5% for lumbar disc herniations with non-verifiable or resolved radiculopathy, and 10% for disc herniations with verified radiculopathy. However, he stated that Ms. Amendolia presented for his examination with non-verifiable left-leg pain.

Considering her neck, Dr. Koenig placed her again in Class 1 category for soft-tissue and nonspecific conditions using Table 17-2 on page 564. Applying the modifiers, Ms. Amendolia had a grade B impairment, which correlated to a 1% permanent whole-person impairment. Using the combined values chart on page 604, Dr. Koenig determined Ms. Amendolia sustained an 8% permanent whole-person impairment.

Regarding permanent restrictions, Dr. Koenig recommended no prolonged extension or flexion of the cervical spine; no repetitive bending, stooping, or squatting; and no lifting more than fifteen pounds.

*Vocational Disability*

To address Ms. Amendolia's vocational disability, Ms. Amendolia saw Dr. Craig Colvin, who holds a doctorate in counselor education with an emphasis in disability management and a master's in rehabilitation counseling. He conducted a situational assessment to determine her current functional level, educational history, past work experience, and activities of daily living to determine the impact on her capacity to work. He also reviewed Ms. Amendolia's discovery responses and deposition testimony, Dr. McMahon's deposition testimony, and the reports of Drs. Bolt and Koenig.

During his situation assessment, Dr. Colvin noted Ms. Amendolia was a fifty-seven-year-old resident of Anderson County, Tennessee. She has a high-school education plus an associate of arts degree in social sciences. She had real estate training twenty-five years ago and received her license. She also briefly worked in insurance sales. Her primary work history was twenty-plus years working with disabled adults.

Ms. Amendolia testified that her past jobs required lifting more than fifteen pounds. She also indicated she is a slow typist and struggled to understand the computer work when she worked in insurance. However, before her work injury, she had no restrictions, required no accommodations, and had no trouble performing her job responsibilities. Following the work injury, she worked light-duty until surgery, when she was taken completely off work. Emory Valley could not accommodate her restrictions, and ultimately her employment ended. She has not worked since.

Based upon his situational assessment, review of the medical opinions, and consideration of her permanent restrictions, Dr. Colvin testified that Ms. Amendolia would not be able to perform the essential functions of her primary occupation as a care provider to disabled persons. He also testified that, considering her permanent restrictions described in the medical records, she would still have a significant occupational disability, approximately 85%-90% in the local labor market. Considering the restrictions in addition to her current complaints and difficulties, Dr. Colvin "doubt[ed] seriously that she could maintain an eight-hour day with her limitations." He indicated that realistically, her restrictions negatively impact her employability but do not restrict her from all jobs.

As for her current symptoms, Ms. Amendolia testified she continues to have low-back problems with pain shooting into her legs as well as neck pain and headaches. She stated she is never completely comfortable and must frequently change positions from sitting to standing. Before the injury, she enjoyed an active lifestyle including hiking, riding motorcycles, and playing with her grandchildren. After the injury, she has difficulty sleeping and cannot clean her home, do laundry, or grocery shop. She either seeks help from her daughter or modifies the activities. She testified she would love to return to work, but she cannot do her prior job. When asked whether she thought she could ever work, she responded, "Never say never," and later "I honestly don't know. I hope I could return to work . . . I don't foresee [returning to work] any time in the near future."

## Findings of Fact and Conclusions of Law
*Standard of Proof*

Ms. Amendolia has the burden of proof on all essential elements of her claim. *Scott v. Integrity Staffing Solutions*, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived

6

at a trial on the merits, the employee must establish by a preponderance of the evidence that . . . she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at \*18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2018).

The parties stipulated that Ms. Amendolia sustained a work-related injury. Emory Valley provided authorized treatment with Drs. McMahon and Bolt, whom Ms. Amendolia selected from panels. Dr. McMahon diagnosed a left L3-L4 herniated disc and a L4-L5 spinal stenosis and assigned a 23% permanent whole-person impairment. Dr. Bolt diagnosed a cervical strain/sprain and assigned a 2% permanent whole-person impairment. As authorized, panel-selected, treating physicians, their opinions on causation and permanent medical impairment are presumed correct. To overcome the presumption, Dr. Koenig's opinion must rebut their opinions by a preponderance of the evidence. *See* Tenn. Code Ann. §§ 50-6-102(14)(E) and 50-6-204(k)(7).

Whenever expert opinions conflict, the Court "has the discretion to choose which expert to accredit." *Woods v. Ace-American Ins.*, No. E2013-01916-SC-R3-WC, 2014 Tenn. LEXIS 617, at \*10-11 (Tenn. Workers' Comp. Panel Aug. 15, 2014). In this case, the Court is faced with two conflicts: (1) medical causation of Ms. Amendolia's spinal stenosis, and (2) the impairment rating for Ms. Amendolia's work-related injuries. In making this decision, the Court "is allowed . . . to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Id.* at \*11 (quoting *Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 676 (Tenn. 1991)).

Considering these factors, all three physicians are board-certified orthopedic surgeons. Both Drs. McMahon and Bolt treated Ms. Amendolia and examined her on numerous occasions. In contrast, Dr. Koenig evaluated Ms. Amendolia only once. Drs. McMahon and Dr. Koenig reviewed Ms. Amendolia's 2011 treatment records and diagnostic tests, although Dr. McMahon did not review the records when he began treating her, while Dr. Koenig did. Dr. McMahon placed little importance on the 2011 treatment, given that Ms. Amendolia continued to work for six years. However, Dr. Koenig found her 2011 treatment important as evidence of preexisting degenerative conditions and because she failed to mention her prior treatment and symptoms.

Also, the Court notes that Dr. McMahon had an opportunity to evaluate and treat Ms. Amendolia on a more extensive basis as compared to Dr. Koenig. As the Tennessee Supreme Court stated, the physician having greater contact with Ms. Amendolia "would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Orman*, 803 S.W.2d at 677.

*Causal Relationship of Ms. Amendolia's L4-L5 spinal stenosis*

The Court next turns to the experts' opinions as to the cause of the L4-L5 spinal stenosis. In weighing Drs. McMahon's and Koenig's causation opinions, a physician's "expertise in utilizing the AMA Guides . . . is not relevant in determining the proper diagnosis[.]" *Payne v. United Parcel Serv., Inc.*, 2014 Tenn. LEXIS 1112, at \*21 (Tenn. Workers' Comp. Panel Dec. 30, 2014). Thus, Emory Valley's objections to Dr. McMahon's impairment calculations are immaterial in deciding which causal opinion to adopt. Indeed, his expertise with the AMA Guides is also not relevant in rebutting Dr. McMahon's presumption of correctness. Rather, the physician's experience, his nuanced explanation of his diagnosis, and defense of his diagnosis are the relevant factors to be considered. *Id.*

Dr. McMahon ultimately concluded Ms. Amendolia's work accident caused the L3-L4 herniated disc and aggravated her L4-L5 spinal stenosis. Despite no initial knowledge of Ms. Amendolia's 2011 complaints, Dr. McMahon testified this information did not affect his causation opinion. He said her history "just [tells] me she had some prior back pain, but she was working evidently in the six years prior to me seeing her until she had this injury." Ms. Amendolia testified she continued to have low-back problems with pain shooting into her legs.

Dr. McMahon treated Ms. Amendolia from August 2017 through the present. He reviewed the 2017 MRI, which showed a left L3-L4 herniated disc compressing on the L4 nerve root and significant L4-L5 spinal stenosis compressing the L5 nerve root. He performed surgery. On February 15, 2018, he placed Ms. Amendolia at MMI for her low back and noted that she still had lower-back pain radiating into her left leg and numbness in her third and fourth toe on the left side. At the hearing, Ms. Amendolia similarly testified to continued low-back pain with radicular pain in her legs.

Dr. Koenig testified that, secondary to the work incident, Ms. Amendolia sustained an L3-L4 disc extrusion, lumbosacral strain, cervical strain without evidence of radiculopathy, and possible malingering. He did not see objective findings of radiculopathy but acknowledged that Ms. Amendolia presented for the examination with left-leg pain.

For these reasons, the Court adopts Dr. McMahon's causation opinion, finding Dr. Koenig's opinion failed to rebut Dr. McMahon's opinion by a preponderance of the evidence. Therefore, the Court concludes Ms. Amendolia's work injury caused the L3-L4 disc herniation and radiculopathy and was the primary cause of the aggravation of her L4-L5 spinal stenosis.

8

*Degree of Permanent Medical Impairment*

In weighing the experts' opinions on permanent impairment, the Court notes Dr. Koenig's additional certifications in disability assessments. Further, Dr. Koenig demonstrated a mastery of the AMA Guides and detailed how he calculated Ms. Amendolia's permanent impairment. Dr. Bolt also explained, in less detail, how he calculated Ms. Amendolia's neck impairment and confirmed his use of the modifiers. However, Dr. McMahon offered little to no explanation for how he arrived at Ms. Amendolia's low-back rating. He identified only the class and admitted that he did not use the modifiers.

For her low back, Dr. Koenig assigned 7% permanent whole-person impairment. He clarified that he rated Ms. Amendolia for her L3-L4 disc herniation as her primary diagnosis and placed her in Class I for nonverifiable radiculopathy. However, Dr. Koenig testified that the minimum permanent whole-person impairment for a disc herniation *with* radiculopathy was 10%.

In contrast, Dr. McMahon assigned a 23% permanent whole-person impairment rating for the low back. He considered both the L3-L4 herniated disc with radiculopathy and the L4-L5 spinal stenosis when arriving at the impairment rating, placing Ms. Amendolia in Class 3 and assigning the maximum rating without using the modifiers. He did not specify how he reached the maximum rating or the individual ratings applicable for the L3-L4 herniated disc and the L4-L5 spinal stenosis, which he "combined" to arrive at the rating.

The Court finds Dr. Koenig's opinions successfully rebutted Dr. McMahon's on permanent impairment. However, after adopting Dr. McMahon's opinions on causation, the Court finds his diagnosis of the L3-L4 disc herniation *with radiculopathy* more persuasive as the treating physician. Thus, based on Dr. Koenig's testimony that the minimum rating for disc herniation with radiculopathy is 10%, the Court finds this as Ms. Amendolia's appropriate rating.

For the neck, Dr. Koenig and Dr. Bolt placed Ms. Amendolia in the same class of impairment. However, Dr. Bolt did not use the modifiers due to lack of objective findings and assigned 2% permanent impairment rating to the whole person. Dr. Koenig used the modifiers and assigned a 1% permanent medical impairment. The Court again adopts Dr. Koenig's permanent impairment and finds that he successfully rebutted Dr. Bolt's opinion by a preponderance of the evidence. Therefore, as for her neck, the Court concludes Ms. Amendolia sustained a 1% permanent whole-person impairment.

Thus, the Court holds that Ms. Amendolia's work injury resulted in a combined 11% permanent whole-person impairment.

*Extent of Permanent Disability*

Ms. Amendolia seeks permanent and total disability (PTD) benefits. The Workers' Compensation Law provides: "When an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled[.]" Tenn. Code Ann. § 50-6-207(4)(B).

The PTD assessment is based upon numerous factors, including the employee's skills and training, education, age, local job opportunities, and capacity to work at the kinds of employment available in her disabled condition. *Roberson v. Loretto Casket Co.*, 722 S.W.2d 380, 384 (Tenn. 1986). Although a rating of anatomical disability by a medical expert is also one of the relevant factors, "the vocational disability is not restricted to the precise estimate of anatomical disability made by a medical witness." *Henson v. City of Lawrenceburg*, 851 S.W.2d 809, 812 (Tenn. 1993). In addition, the employee's "own assessment of [her] physical condition and resulting disability is competent testimony that should be considered[.]" *McIlvain v. Russell Stover Candies, Inc.*, 996 S.W.2d 179, 183 (Tenn. 1999).

In support of her PTD claim, Ms. Amendolia relied on Dr. Colvin's testimony concerning her vocational disability. Dr. Colvin testified that she would not be able to perform the essential functions of her primary occupation as a care provider to the disabled. He also testified that, considering her permanent restrictions, she would still have a significant occupational disability, approximately 85%-90% in the local labor market. In light of the restrictions and her current complaints and difficulties, Dr. Colvin indicated that, realistically, her restrictions negatively impact her employability but admitted that her restrictions do not prohibit her from all jobs. In addition, while Drs. McMahon, Bolt, and Koenig assigned permanent restrictions, they did not indicate that she was totally disabled from working due to her work-related conditions.

Moreover, when asked whether she thought she could ever work, Ms. Amendolia responded, "Never say never," and later "I honestly don't know. I hope I could return to work . . . I don't foresee [returning to work] any time in the near future." The Court finds Ms. Amendolia credible despite her inability to recall her 2011 low-back treatment.

Considering Dr. Colvin's testimony, the permanent restrictions, and Ms. Amendolia's self-assessment of her work injury and resulting disability, the Court cannot conclude that she is permanently and totally disabled. Thus, the Court denies her claim for these benefits.

The Court must then determine Ms. Amendolia's entitlement to permanent partial disability benefits. The Workers' Compensation Law provides an injured employee may recover the "original award," which is calculated by multiplying the permanent medical

10

impairment rating by 450 weeks and then multiplying the result by the employee's weekly compensation rate. This is the employee's initial period of compensation; the period is determined by multiplying the rating by 450 weeks. *See Batey v. Deliver This, Inc.*, 2018 TN Wrk. Comp. App. Bd. LEXIS 2, *7-8 (Feb. 6, 2018); *see also* Tenn. Code Ann. § 50-6-207(A).

The Court holds Ms. Amendolia is entitled to an original award based upon an 11% permanent impairment rating. Her original award equates to 49.5 weeks at her stipulated compensation rate of $346.78, or $17,165.61.

Further, the Court finds that Ms. Amendolia's initial compensation period expired on March 29, 2019. Therefore, the Court holds her claims for increased benefits under Tennessee Code Annotated section 50-6-207(3)(B) and extraordinary relief under Tennessee Code Annotated section 50-6-242(a) are ripe for adjudication. The parties shall appear for a Scheduling Hearing to set briefing deadlines and an evidentiary hearing on these limited issues.

**IT IS, THEREFORE, ORDERED** as follows:

1. Emory Valley shall provide Ms. Amendolia with medical treatment for her work injuries with Drs. McMahon and Bolt as the authorized treating physicians.

2. Emory Valley shall pay Ms. Amendolia an original award lump-sum payment of $17,165.61. From this award, Ms. Amendolia's counsel shall be paid a lump-sum 20% attorney fee, or $3,433.12.

3. Ms. Amendolia's claims for increased benefits and extraordinary relief are reserved at this time.

4. This case is set for a **Scheduling Hearing** on **September 12, 2019**, at **11:00 a.m. Eastern Time**. The parties must call (865) 594-0091 or (toll-free) (855) 543-5041 to participate.

5. This Order shall not become final until the Compensation Order on the remaining issues is entered.

**ENTERED September 3, 2019.**

**PAMELA B. JOHNSON, JUDGE**
**Court of Workers' Compensation Claims**

11

# APPENDIX

Technical Record:

1. Petition for Benefit Determination - March 9, 2018
2. Petition for Benefit Determination - June 11, 2018
3. Petition for Benefit Determination - September 17, 2018
4. Dispute Certification Notice - November 21, 2018
5. Scheduling Order
6. Employee's Motion to Deem Admitted Requests for Admission
7. Employer's Response to Employee's Motion to Deem Admitted
8. Order Denying Motion to Deem Admitted
9. Employee's Motion to Exclude Dr. Koenig's Testimony and Report
10. Dispute Certification Notice - July 10, 2019
11. Employer's Motion Requesting Scheduling Hearing and Continuance
12. Employee's Proposed Exhibit List
13. Employee's Proposed Witness List
14. Employee's Prehearing Brief
15. Employer's Prehearing Brief
16. Employer's Witness and Exhibit List
17. Employer's Response to Employee's Motion to Exclude Dr. Koenig's Testimony
18. Employee's Response to Employer's Motion Requesting Scheduling Hearing and Continuance

Exhibits:

1. Employee's Deposition - Page 60
2. Employee's Responses to Interrogatories and Requests to Produce
3. Dr. Cletus McMahon's Deposition
4. Dr. Patrick Bolt's Deposition
5. Dr. Craig Colvin's Curriculum Vitae
6. Dr. Craig Colvin's Report
7. Dr. Thomas Koenig's Deposition

## CERTIFICATE OF SERVICE

I certify that a copy of the Compensation Order was sent on September 3, 2019.

| Name | Certified Mail | Fax | Email | Service sent to: |
|---|---|---|---|---|
| Timothy Roberto, Employee's Attorney | | | X | troberto@brownandroberto.com |
| Chris R. Brooks Employer's Attorney | | | X | crbrooks@mijs.com |

**PENNY SHRUM, COURT CLERK**
**WC.CourtClerk@tn.gov**

13