**FILED**
**Jul 06, 2021**
**12:05 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT MEMPHIS

| | | |
|---|---|---|
| **TAWAN BRADEN,** | ) | **Docket No. 2019-08-0544** |
| **Employee,** | ) | |
| **v.** | ) | |
| **MOHAWK INDUSTRIES, INC.,** | ) | **State File No. 89807-2016** |
| **Employer,** | ) | |
| **And** | ) | |
| **LIBERTY INSURANCE CORP.,** | ) | **Judge Deana C. Seymour** |
| **Carrier.** | ) | |

## COMPENSATION ORDER

The Court held a Compensation Hearing on June 2, 2021, on Mr. Braden's claim for workers' compensation benefits for his ankle injury. Specifically, Mr. Braden asked for permanent total disability or increased permanent partial disability benefits, unpaid temporary disability benefits, and future medical treatment, including medications denied under utilization review.

Mohawk Industries conceded that Mr. Braden would be entitled to permanent partial disability with increased benefits for his ankle fracture. However, it denied his entitlement to permanent total disability benefits, contending Mr. Braden's current complaints and permanent restrictions related to a subsequent intervening injury. Mohawk also denied liability for temporary disability benefits and claimed it overpaid those benefits. It further denied responsibility for the medications at issue based on a lack of medical necessity.

For the reasons below, the Court holds that Mr. Braden is entitled to permanent total disability benefits. The Court denies both parties' claims regarding temporary disability benefits. Further, the Court holds Mohawk must provide the medications prescribed by Dr. McGaughey plus future authorized, reasonable, and necessary medical treatment.

## History of Claim

1

Mr. Braden worked as a truck driver and performed heavy manual labor for over twenty years. On November 15, 2016, Mr. Braden injured his right ankle while unloading a roll of carpet for Mohawk Industries. He received treatment from Dr. David Richardson, whom the parties stipulated was an authorized physician.

Dr. Richardson diagnosed Mr. Braden with a right lateral malleolus fracture and deltoid ligament injury. He surgically repaired the fracture by implanting hardware. In February 2017, Dr. Richardson performed a second surgery to remove a screw. He placed Mr. Braden at maximum medical improvement in April 2017, noting that Mr. Braden had no pain and could return to full-duty work without restriction.

Mr. Braden returned to work for Mohawk but presented to Dr. Richardson on July 12 with complaints of swelling and significant pain over his remaining hardware after sustaining what the office note described as a "twisting injury" and a "pop to his lateral aspect of his right ankle." The note also mentioned Mr. Braden was having difficulty loading trucks as part of his job. According to Mr. Braden, he was walking to the bathroom at work on July 11 when his increase in pain occurred. He immediately advised his manager that he needed to see Dr. Richardson. Mr. Braden denied tripping, slipping and falling, using the stairs, or carrying anything when he felt the increased pain. Dr. Richardson conceded in his testimony that too much time had passed for him to remember the specifics of his discussion with Mr. Braden mentioned in the note.

Dr. Richardson performed two additional surgeries, one on July 31 to remove the remaining hardware and another in April 2018 to repair a torn peroneal tendon and debride scar tissue from Mr. Braden's ankle. After the surgeries, Dr. Richardson treated Mr. Braden with physical therapy and pain medication and took him completely off work before releasing him to "sit down work only."[1]

Mr. Braden testified that Mohawk accommodated these restrictions by having him sort papers but did not specify when these accommodations occurred. Due to his medication, Mr. Braden often fell asleep while performing his light-duty work. According to Mr. Braden, his manager knew this was happening but did not say anything to him about it. Dr. Richardson kept Mr. Braden under restrictions from June 21, 2018, until he released him.

In September 2018, Dr. Richardson ordered a Functional Capacity Evaluation. The report suggested that Mr. Braden provided a valid evaluation but with "only fair efforts overall." According to the evaluator, Mr. Braden was performing in a light-work range

---

[1] Mohawk paid temporary disability benefits from July 31, 2017, to September 17, 2017, and from April 23, 2018, to July 4, 2018. The parties stipulated to a weekly compensation rate of $705.75 based on an average weekly wage of $1,058.63.

for material handling, but due to the level of his performance, she felt he should be able to perform at least in a medium-work range.

Dr. Richardson placed Mr. Braden at maximum medical improvement on November 8 with a five-percent permanent impairment rating to the body as a whole.[2] He noted permanent restrictions including no squatting or kneeling, no climbing stairs or ladders, no pushing or pulling over thirty-five pounds, and no lifting or carrying over thirty-five pounds. In addition, he prescribed a cane for Mr. Braden and referred him for pain management.

Mr. Braden began authorized pain management with Dr. Ryan McGaughey in February 2019. He documented Mr. Braden's consistent right-ankle pain, which affected his walking. He prescribed pain medication and physical therapy. According to Dr. McGaughey, the prescribed medications "provide[d] functional improvement and analgesic relief." However, Mohawk denied some of the medications prescribed by Dr. McGaughey based on utilization review.[3] Dr. McGaughey testified by deposition that the denied treatment was reasonable and medically necessary. As of the hearing date, he continued to see Mr. Braden every two to four months.

In September 2019, Dr. Richardson noted progressive pain and an antalgic gait that caused him to update Mr. Braden's permanent restrictions. The updated restrictions prohibited repetitive stair-climbing and squatting and limited standing to no more than fifteen minutes at a time, walking to no more than fifty yards at a time, and lifting to no more than fifteen pounds repetitively.

Dr. Richardson testified that Mr. Braden's ankle problems were primarily related to his employment. He based his five-percent impairment rating on the ankle fracture and deltoid ligament injury resulting from Mr. Braden's November 15, 2016 accident. On cross-examination, he agreed that his office notes suggested Mr. Braden sustained a later twisting injury in July 2017. This second injury occurred three months after he initially placed Mr. Braden at maximum medical improvement for his work injury. Dr. Richardson noted that Mr. Braden was pain-free in April 2017 before this new injury occurred. Moreover, Dr. Richardson testified that the peroneal tendon tear he repaired in April 2018 was not present when he surgically repaired Mr. Braden's ankle fracture in November 2016. Therefore, he related the tear to the July 2017 injury. He also advised it was difficult to determine how much each injury contributed to Mr. Braden's current

---

[2] Dr. Michael Calfee performed a MIRR evaluation in February 2020, and he also arrived at a five-percent rating to the body as a whole.

[3] Mohawk has denied other treatment recommended by both Dr. Richardson and Dr. McGaughey. However, based on the UR documentation in evidence, only the denials for the prescribed Hydrocodone, Lidocaine Patches, and Diclofenac Gel were sent through the UR appeal process. Mr. Braden has paid for his Hydrocodone prescription but has not been able to afford the others.

complaints and permanent restrictions.

Dr. Richardson added, however, that Mr. Braden "had an increased risk of injury with a twisting mechanism because of his original injury." Dr. Richardson specifically testified that "his previous injury would have made him increase susceptibility to have [a peroneal tendon tear] when he had a twist." He stated,

I think he would have an increased risk of it happening, because he had previous surgery, because he had had hardware . . . right by the tendon. He had scar tissue. . . . [S]o that is also going to increase his risk of . . . getting a peroneal tendon tear.

Dr. Richardson further noted that Mr. Braden could tear his tendon "from fairly normal sort of everyday ambulation because of the original injury." He commented that "[y]ou can have more of an attritional-type tear, where you can get a split tear just from over time that tendon rubbing back and forth over a previous lateral malleolus fracture and hardware." Dr. Richardson also said that Mr. Braden "could end up with a tendon tear because of his original injury without really a significant additional traumatic event." He additionally acknowledged that a peroneal tendon tear could also occur without a prior fracture. When asked if the tendon tear could be a natural progression of the fracture, Dr. Richardson testified, "[I]t's my opinion that that can occur."

Turning to evidence regarding disability benefits, Mr. Braden testified that he was forty-three years old and had limited employment opportunities because he could not walk or sit for long periods, climb stairs, or bend. He stated that he could not perform clerical work due to reading difficulties and noted that he had not obtained his high school diploma or a GED. He further advised that he had applied for other jobs but had not worked since his release from Dr. Richardson's care on November 8, 2018. He applied for manual labor positions, such as forklift driver jobs, because those were the only types of jobs he knew how to perform. However, he was not hired because of his permanent restrictions and medications.

Mr. Braden's wife, Rinalda Braden, testified that the injury changed Mr. Braden's life. Before his accident, he was the family's main source of income. She testified that driving was second nature to Mr. Braden and that he was a third-generation truck driver who was good at what he did. However, due to the medication he takes, he sleeps a lot and has memory problems. Mr. Braden cannot help around the house, work out, or play with his children like he once did. They no longer go out to dinner, take walks, or take vacations. He attends church every Sunday with his family, but they must stop ten minutes into the drive to allow him to stretch his leg. In addition, he sits in the back of the church so he can get up and down during the service without disturbing others. Mrs. Braden assists her husband with job applications and resumés due to his reading difficulties.

4

Mr. Braden's vocational expert, Dr. David Strauser, testified via videoconference. Dr. Strauser noted that Mr. Braden received special education services in high school, dropped out in 1997, and never earned a GED. After leaving school, Mr. Braden collected trash for waste management and worked in a warehouse for a temporary service. He then attended truck driving school in 2000 and worked as a truck driver until this ankle injury. Dr. Strauser determined that Mr. Braden sustained a 100-percent vocational impairment.[4]

According to Dr. Strauser, Mr. Braden had no transferable job skills and would be unable to maintain a job in the open labor market. Dr. Strauser based his opinions on a two-hour interview of Mr. Braden, an analysis of Mr. Braden's transferable job skills, his review of Mr. Braden's medical records, and vocational testing showing that Mr. Braden read at a kindergarten level. Dr. Strauser further based his opinions on Dr. Richardson's permanent restriction to a light-work classification, as well as Mr. Braden's history of heavy manual labor, kindergarten-level reading scores, and use of a cane. He also stated that the medication Mr. Braden currently takes makes him drowsy, which would likewise hinder his ability to maintain a job. Dr. Strauser noted that, while employers might accommodate restricted employees seeking higher-skilled jobs, they are not likely to do so for manual labor jobs.

Mohawk offered no vocational testimony. In addition, it offered no proof to show the periods during which it accommodated Mr. Braden's restrictions.

**Findings of Fact and Conclusions of Law**

At a Compensation Hearing, Mr. Braden must prove by a preponderance of the evidence that he is entitled to the requested benefits. *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2020).

The Court first considers whether Mr. Braden's peroneal tendon tear was a natural progression of his original work injury. The general rule in Tennessee is that a "subsequent injury, whether in the form of an aggravation of the original injury or a new and distinct injury, is compensable if it is the 'direct and natural result' of a compensable injury." *Anderson v. Westfield Grp.*, 259 S.W.3d 690, 696 (Tenn. 2008). The direct and natural consequences rule provides that "[w]hen the primary injury is shown to have

---

[4] Mohawk argued that Dr. Strauser destroyed evidence by discarding his handwritten notes from his interview with Mr. Braden. It contended that sanctions, up to and including striking Dr. Strauser's testimony, would be appropriate under the Rules of Civil Procedure. The Court disagrees. Dr. Strauser appeared at the hearing if Mohawk wished to question him about his notes. Further, Dr. Strauser's handwritten notes were created to assist him in drafting his report, and he credibly testified that he included all relevant portions of the notes in his report.

arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment." *Id*. at 696-97. The rationale for this rule is that "the original compensable injury is deemed the cause of the damage flowing from the subsequent injury-producing event." *Id*. at 697; *see also Lee v. W. Plastics*, 2016 TN Wrk. Comp. App. Bd. LEXIS 53, at *6-7 (Oct. 20, 2016).

On the other hand, Tennessee law is also clear that the rule has a limit. "That limit hinges on whether the subsequent injury is the result of independent intervening causes, such as the employee's own conduct." *Anderson*, 259 S.W.3d at 697. Tennessee courts have consistently held an employee's actions can constitute an independent intervening incident sufficient to break the chain of causation if the employee's conduct is negligent, reckless, or intentional. *Id*. at 698.

Here, the parties agreed that Mr. Braden's original ankle fracture and deltoid ligament injury arose primarily out of and in the course of his employment. Further, Mr. Braden's credible and uncontroverted testimony was that he was simply walking to the bathroom at work on July 11, 2017, when he felt a sharp pain in his leg. No evidence showed that Mr. Braden's own conduct caused the July 2017 incident. Based on the absence of proof suggesting negligent, reckless, or intentional conduct on Mr. Braden's part, the Court holds the subsequent injury was not the result of an independent intervening cause.

In addition, Dr. Richardson noted on multiple occasions throughout his deposition that Mr. Braden's original injury made him more susceptible to further injury. He specifically testified that the original injury increased Mr. Braden's risk of sustaining a peroneal tendon tear due to the hardware and scar tissue from his initial surgery. He further testified that this type of tear could occur "from fairly normal sort of everyday ambulation because of the original injury." When asked whether Mr. Braden's tendon tear could be a natural progression of his earlier fracture, Dr. Richardson testified, "[I]t's my opinion that that can occur."

While Dr. Richardson's deposition testimony was far from straightforward, he never wavered on his opinion that the original injury predisposed Mr. Braden to the very injury he sustained by simply walking. Further, Dr. Richardson's notes provide extremely limited information about the July 2017 incident. He specifically testified that he could not recall his conversation with Mr. Braden or the details of the July 2017 incident.

Based on Mr. Braden's description of the July 2017 event and Dr. Richardson's testimony regarding the increased risk Mr. Braden's original injury posed, the Court holds that Mr. Braden's later peroneal tendon injury was a direct and natural consequence of his compensable ankle fracture.

The Court now turns to Mr. Braden's request for permanent total disability

benefits. Tennessee law provides that, "[w]hen an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled[.]" Tenn. Code Ann. § 50-6-207(4)(B).

The assessment of permanent total disability is based on numerous factors, including the employee's skills and training, education, age, local job opportunities, and the capacity to work at the kinds of employment available in the disabled condition. *Roberson v. Loretto Casket Co.*, 722 S.W.2d 380, 384 (Tenn. 1986); *see also Duignan v. Stowers Mach. Corp.*, No. E2018-01120-SC-R3-WC, 2019 Tenn. LEXIS 224, at *21 (Tenn. Workers' Comp. Panel June 19, 2019). Although a rating of anatomical disability by a medical expert is one of the relevant factors, "the vocational disability is not restricted to the precise estimate of anatomical disability made by a medical witness." *Henson v. City of Lawrenceburg*, 851 S.W.2d 809, 812 (Tenn. 1993). In addition, the employee's "own assessment of [his] physical condition and resulting disability is competent testimony that should be considered[.]" *McIlvain v. Russell Stover Candies, Inc.*, 996 S.W.2d 179, 183 (Tenn. 1999); *see also Duignan*, 2019 Tenn. LEXIS 224, at *21-22.

Here, Mr. Braden's expert, Dr. Strauser, was the only vocational expert to testify. Dr. Strauser aptly explained his methodology, and the Court found his unopposed testimony persuasive and helpful to the permanent disability analysis. He testified that Mr. Braden had no transferable job skills and would be unable to maintain a job in the open labor market. He assigned 100-percent vocational disability when considering Dr. Richardson's permanent restrictions, as well as Mr. Braden's history of heavy manual labor, kindergarten-level reading scores, and use of a cane. In addition, he stated that Mr. Braden's medication makes him drowsy, which would likewise hinder his ability to maintain a job. His opinion remained steadfast even under intense cross examination.

Mr. and Mrs. Braden's testimony additionally supports a conclusion that Mr. Braden is unable to work at any occupation. Mr. Braden was forty-three years old at the time of the hearing and had not finished high school or obtained a GED. He worked as a truck driver for over twenty years and always performed heavy manual labor jobs. He cannot walk or sit for long periods, climb stairs, or perform clerical work. His medication causes sleepiness and memory loss. He has difficulty reading and needs assistance from his wife to complete job applications and resumés. Further, despite attempts to find work, he has not held a job since reaching maximum medical improvement on November 8, 2018.

Based on the foregoing, the Court concludes the preponderance of the evidence shows Mr. Braden is permanently and totally disabled. He is entitled to weekly benefits from November 8, 2018, "until [he] is, by age, eligible for full benefits in the Old Age Insurance Benefit Program under the Social Security Act." *See* Tenn. Code Ann. § 50-6-

207(4)(A)(i).

Next, the Court must determine whether Mr. Braden is entitled to additional temporary disability benefits. The period in dispute falls between July 5, 2018, the date Mohawk stopped paying temporary benefits, and November 8, the date Dr. Richardson placed Mr. Braden at maximum medical improvement.

Dr. Richardson kept Mr. Braden under restrictions from June 21, 2018, until he reached maximum medical improvement on November 8. However, the parties provided no proof regarding Mr. Braden's work status during this period. While Mr. Braden acknowledged that Mohawk accommodated his restrictions at some point, he did not specify when these accommodations took place. Without this proof, the Court cannot determine whether additional benefits are owed.

Further, because no evidence showed when Mohawk accommodated Mr. Braden's restrictions, the Court cannot find an overpayment of temporary disability benefits. Without this proof, Mohawk is not entitled to the requested credit.

Turning to the issue of medical benefits, Mr. Braden continues to treat with Dr. McGaughey for pain management based on Dr. Richardson's referral. Dr. McGaughey prescribed several medications, which Mohawk later denied based on utilization review. At his deposition, Dr. McGaughey testified that the denied treatment was reasonable and medically necessary.

Tennessee Code Annotated section 50-6-204(a)(3)(H) provides: "Any treatment recommended by a physician or chiropractor selected pursuant to this subdivision (a)(3) or by referral, if applicable, shall be presumed to be medically necessary for treatment of the injured employee." This presumption is rebuttable by a preponderance of the evidence. *See Morgan v. Macy's*, 2016 TN Wrk. Comp. App. Bd. LEXIS 39, at *17 (Aug. 31, 2016). A trial court may assess the validity of the utilization review reports and determine the relative weight to be given those physicians' opinions as well as other expert medical opinions. *Venable v. Superior Essex*, 2016 TN Wrk. Comp. App. Bd. LEXIS 56, at *9 (Nov. 2, 2016).

Since the parties stipulated that Dr. Richardson and Dr. McGaughey were Mr. Braden's authorized physicians, their treatment is presumed medically necessary. Mohawk relied on multiple UR reports and UR appeal decisions to rebut the presumption. However, none of these reports provided an adequate explanation of how Dr. McGaughey's recommended treatment was unreasonable or unnecessary. According to the UR documentation in evidence, the Hydrocodone prescription was denied on multiple occasions based on insufficient evidence of functional benefit. Regarding the Lidocaine Patches and Diclofenac Gel, the reasoning behind the denials was Dr. McGaughey's failure to try other over-the-counter alternatives first.

Dr. McGaughey began treating Mr. Braden in February 2019 after Dr. Richardson's pain management referral. He continues to see Mr. Braden every two to four months. Dr. McGaughey's office notes document Mr. Braden's consistent complaints of right-ankle pain, which affects his walking. Moreover, according to Dr. McGaughey, the prescribed medications "provide functional improvement and analgesic relief." When comparing conflicting expert opinions, "physicians having greater contact with the [injured worker] would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 677 (Tenn. 1991).

The Court holds that Mohawk failed to overcome the statutory presumption of medical necessity by a preponderance of the evidence. Therefore, it must provide the medications prescribed by Dr. McGaughey. In addition, it must provide future medical treatment as recommended by Mr. Braden's authorized medical providers in accordance with Tennessee Code Annotated section 50-6-204.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mohawk Industries, Inc. shall continue to provide Mr. Braden with medical treatment for his work injury under Tennessee Code Annotated section 50-6-204. Dr. Richardson and Dr. McGaughey will remain his authorized physicians.

2. Mohawk Industries, Inc. shall provide all medications prescribed by the authorized physicians.

3. Mohawk Industries, Inc. shall pay Mr. Braden a lump sum of $97,393.50 representing 138 weeks of benefits, for accrued permanent total disability benefits from November 18, 2018, to the date of the issuance of this Order.

4. Mohawk Industries, Inc. shall pay ongoing permanent total disability benefits on a weekly or bi-weekly basis until Mr. Braden is eligible for full Old Age Social Security retirement benefits and his permanent total disability award is paid in full. The amount of this weekly benefit will be determined under Tennessee Code Annotated section 207(4)(A)(ii)(c) after Mr. Braden's attorney's fee is set.

5. The Court denies Mr. Braden's request for additional temporary disability benefits as well as Mohawk Industries, Inc.'s claim for reimbursement for an overpayment of temporary disability benefits.

6. Mr. Braden's attorney shall file a motion for attorney fees and expenses within seven business days of the date of this order.

7. Costs of $150.00 are assessed against Mohawk Industries, Inc. under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (August 2019), to be paid within five days of this order becoming final.

8. Mohawk Industries, Inc. shall prepare and file a statistical data form within ten business days of the date of this Order under Tennessee Code Annotated section 50-6-224.

9. This Order will not become final for appeal purposes until after the Court enters an Order approving fees for Mr. Braden's attorney and recalculates the weekly benefit to be paid.

**ENTERED July 6, 2021.**

_____
**JUDGE DEANA C. SEYMOUR**
**Court of Workers' Compensation Claims**

**APPENDIX**

**Exhibits**
1. Deposition transcript of Dr. David Richardson
2. Deposition transcript of Dr. Ryan McGaughey
3. Medical records filed on May 19, 2021 and May 27, 2021
4. First Report of Work Injury
5. Wage Statement
6. Vocational Report of Dr. David Strauser
7. Utilization Review paperwork
8. Dr. David Strauser's curriculum vitae
9. Spreadsheet of temporary disability benefit payments (late-filed exhibit)

**Technical Record**
1. Petition for Benefit Determination
2. Dispute Certification Notice (August 5, 2019) along with additional issues raised by the parties
3. Scheduling Hearing Order
4. Amended Scheduling Order
5. Notice of Filing Deposition Transcript of Dr. David Richardson
6. Notice of Filing Deposition Transcript of Dr. Ryan McGaughey
7. Motion for Zoom Appearance by Dr. David Strauser
8. Employee's Witness List

9. Employee's Exhibit List
10. Pre-Compensation Hearing Statement
11. Employee's Pre-Compensation Hearing Brief
12. Employer's Witness and Exhibit list
13. Dispute Certification Notice (August 14, 2020)
14. Order on Motion for Zoom Appearance by Dr. David Strauser

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on July 6, 2021.

| Name | Email | Service sent to: |
|------|-------|------------------|
| Monica Rejaei, Employee's Counsel | X | mrejaei@nstlaw.com |
| Byron Lindberg, Employer's Counsel | X | blindberg@hallboothsmith.com |

_____
**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**

11



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

*[Signature of appellant or attorney for appellant]*